# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 01-3202

SIEGFRIED HERRNREITER,

*Plaintiff-Appellant,*

v.

CHICAGO HOUSING AUTHORITY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 5209—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED OCTOBER 18, 2002—DECIDED DECEMBER 30, 2002

Before POSNER, DIANE P. WOOD, and EVANS, *Circuit Judges.*

POSNER, *Circuit Judge.* The Chicago Housing Authority's Office of the Inspector General has two divisions, auditing and (field) investigations. The plaintiff in this Title VII case, Siegfried Herrnreiter, is an accountant who was employed in the auditing division. Investigators traditionally are trained law enforcement officers, such as former police officers or Treasury agents. But the Inspector General decided that it might be helpful in financial investigations if one of the investigators was an auditor, so Herrnreiter was transferred to the investigation division.

He *loved* being an investigator. He found it more interesting and challenging than auditing, and he also had the use of a car supplied by the CHA and did not have to sign in and out of the office, as he had had to do as an auditor. But the idyll was short-lived. After six months the newly appointed Inspector General, Leonard Odom—who had approved Herrnreiter's transfer to the investigations division several months after it had taken place—transferred him back to auditing. A couple of months later Odom fired Herrnreiter, ostensibly for unsatisfactory performance of the auditing tasks that had been assigned to him. Herrnreiter is a white, naturalized U.S. citizen of German origin; Odom is black; and Herrnreiter contends that his transfer back to the auditing division and his subsequent termination were motivated by his race and national origin. The district court granted summary judgment for the housing authority.

Title VII does not forbid every act of invidious discrimination that an employer might commit against an employee; the act must be "with respect to [the employee's] compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). The cases paraphrase this either as "a tangible employment action," that is, "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998), or as a "materially adverse employment action," *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002); *Haugerud v. Amery School District*, 259 F.3d 678, 691 (7th Cir. 2001); see also *Ford v. General Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002). Herrnreiter interprets these paraphrases to mean *any* action that displeases the employee. If he is right, one dirty look would be enough to trigger liability under Title VII. The language

that we have quoted from the statute and the case law does not support his interpretation, but we do not stop there.

The cases that find the statutory criterion (however it should be formulated) satisfied can be divided into three groups:

1. Cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including, of course, as the limiting case, termination of employment. See, e.g., *Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 876 (7th Cir. 1999); *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996); *Greer v. St. Louis Regional Medical Center*, 258 F.3d 843, 845-46 (8th Cir. 2001).

2. Cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted. See, e.g., *Flaherty v. Gas Research Institute*, 31 F.3d 451, 456-57 (7th Cir. 1994); *Crady v. Liberty National Bank & Trust Co.*, 993 F.2d 132, 135-36 (7th Cir. 1993); *Collins v. Illinois*, 830 F.2d 692, 703-04 (7th Cir. 1987); *Rodriguez v. Board of Education*, 620 F.2d 362, 366 (2d Cir. 1980); *Torre v. Casio, Inc.*, 42 F.3d 825, 831, 834-35 and n. 7 (3d Cir. 1994). These cases differ from those in the first category only in involving a future rather than present harm; the harm nevertheless is financial. They are to be distinguished from cases involving "a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance. . . . [Such a transfer] cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in work-

ing conditions will not do, either." *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996).

2a. A variant of category 2 is where the employee's job is changed in a way that injures his career just as in the cases in that category except that there is no transfer. See, e.g., *Dahm v. Flynn*, 60 F.3d 253, 256-57 (7th Cir. 1994); *Chuang v. University of California Davis*, 225 F.3d 1115, 1125-26 (9th Cir. 2000).

3. Cases in which the employee is not moved to a different job or the skill requirements of his present job altered, but the *conditions* in which he works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment—an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet. See, e.g., *Smart v. Ball State University*, *supra*, 89 F.3d at 441 n. 1; *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 152-53 (3d Cir. 1999); *Parrish v. Immanuel Medical Center*, 92 F.3d 727, 731-32 (8th Cir. 1996); see also *Spring v. Sheboygan Area School District*, 865 F.2d 883, 885-86 (7th Cir. 1989); *Meyer v. Brown & Root Construction Co.*, 661 F.2d 369, 372 (5th Cir. 1981); cf. *Parrett v. City of Connersville*, 737 F.2d 690, 693-94 (7th Cir. 1984). This category includes cases of constructive discharge: the employer has made the job unbearable for the employee. E.g., *id.*; *EEOC v. University of Chicago Hospitals*, 276 F.3d 326, 331-32 (7th Cir. 2002); *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998). It also includes cases of harassment: mistreatment of an employee by coworkers or supervisors that is sufficiently severe to worsen substantially his conditions of employment as they would be perceived by a reasonable person in the position of the employee. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786-88 (1998); *Hilt-Dyson*

*v. City of Chicago*, 282 F.3d 456, 462-63 (7th Cir. 2002). Categories 2, 2a, and 3 often overlap. See, e.g., *Collins v. Illinois, supra*, 830 F.2d at 703-04.

What remains are cases of purely subjective preference for one position over another—which is this case. An auditor's job is not objectively inferior to an investigator's job that has identical financial terms; nor is an accountant who is transferred from investigations to audits deprived of the opportunity to use the skills for which he is trained—the opposite is the case. The use of a company car and being excused from having to sign in or out of an office might be preferred by some employees, but not having to run around all day might be considered by others ample compensation for giving up those particular perks. The two jobs were equivalent other than in idiosyncratic terms that do not justify trundling out the heavy artillery of federal antidiscrimination law; "otherwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit. The Equal Employment Opportunity Commission, already staggering under an avalanche of filings too heavy for it to cope with, would be crushed, and serious complaints would be lost among the trivial." *Williams v. Bristol-Myers Squibb Co., supra*, 85 F.3d at 274; see also *Burger v. Central Apartment Management, Inc.*, 168 F.3d 875, 879 (5th Cir. 1999) (per curiam); *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999); *Forkkio v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002).

Out of caution we note that some of the cases we have cited because they contain good discussions of when an adverse employment action is actionable were actually cases involving retaliation. We do not mean to suggest by such citations that retaliation, to be actionable under Title VII (or other statutes), has to involve an adverse employ-

ment action. It does not. *Aviles v. Cornell Forge Co.*, 183 F.3d 598, 605-06 (7th Cir. 1999), 241 F.3d 589, 593 (7th Cir. 2001); *Passer v. American Chemical Society*, 935 F.2d 322, 331-32 (D.C. Cir. 1991); *EEOC Compliance Manual* § 8, ¶ 8008 (1998) (directive No. 915.003); see also *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891-92 (7th Cir. 1996). Some cases reach this conclusion by interpreting "adverse employment action" in the retaliation context as not requiring an actual *employment* action; an example is *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986-87 (10th Cir. 1996), where the retaliation took the form of preferring charges of theft and forgery against an employee who had filed a charge of discrimination. See also *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000). As we explained in *McDonnell v. Cisneros*, 84 F.3d 256, 258-59 (7th Cir. 1996), "No limiting language appears in Title VII's retaliation provision. 42 U.S.C. § 2000e-3(a). The language of 'materially adverse employment action' that some courts employ in retaliation cases is a paraphrase of Title VII's basic prohibition against employment discrimination, found in 42 U.S.C. §§ 2000e-2(a)(1) and (2). . . . The provision regarding retaliation may intentionally be broader, since it is obvious that effective retaliation against employment discrimination need not take the form of a job action." We left open in that case the question whether retaliation in other forms was actionable under Title VII, remarking that "shooting a person for filing a complaint of discrimination would be an effective method of retaliation, though . . . the victim of the retaliation would have other, and more powerful, remedies than a suit under Title VII. This would be a reason for confining the provision to retaliation that takes the form of an adverse job action." *Id.* at 259. The cases cited earlier in this paragraph have now resolved the issue by holding that the provision is not so confined.

But what if the retaliation *does* take the form of an employment action: must that action be as severe as would be required if the action were charged as discrimination rather than as retaliation? The cases like *Berry* that define adverse employment action more broadly in the retaliation context implicitly answer "no," though many cases state or more commonly assume that the answer is "yes." See, e.g., *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1086 (7th Cir. 2000); *Heuer v. Weil-McLain*, 203 F.3d 1021, 1023 (7th Cir. 2000); *Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1111 n. 7 (7th Cir. 1998); *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996); *Fierros v. Texas Dept. of Health*, 274 F.3d 187, 191, 193 (5th Cir. 2001); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997). That may be a welcome simplification, but it can be criticized especially in cases in which an employee is retaliated against for making or more commonly assisting a complaint on behalf of a coworker, see, e.g., *Rucker v. Higher Educational Aids Board*, 669 F.2d 1179, 1182 (7th Cir. 1982); *Johnson v. University of Cincinnati*, 215 F.3d 561, 580-81 (6th Cir. 2000); *Weiss v. Parker Hannifan Corp.*, 747 F. Supp. 1118, 1130 (D.N.J. 1990), as it presumably takes rather little to deter such altruistic action, which is nevertheless protected by the statute. We are not aware that any of the decisions that equate the standards for discrimination and retaliation involved a third-party complaint. This is not an issue to be resolved in this case, however, which does not involve retaliation, and we mention it only to emphasize that in citing retaliation cases for their discussion of what "materially adverse employment action" means we do not necessarily endorse the view that such an action is always required to make retaliation actionable under Title VII.

Although the transfer of Herrnreiter back to the audit division was not actionable under Title VII, we must con-

sider the discharge that followed; obviously that was a materially adverse employment action. Herrnreiter argues that he was "set up" by Odom to fail by being given tasks that he could not be expected to complete within the prescribed deadlines and then being fired when he failed to make them. This is a perfectly good theory of discrimination, see, e.g., *McPhaul v. Board of Commissioners*, 226 F.3d 558, 565 (7th Cir. 2000); *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990); *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 54-55 (2d Cir. 1998); *Stacks v. Southwestern Bell Yellow Pages*, 27 F.3d 1316, 1325-26 (8th Cir. 1994), but it is not supported by the facts. Herrnreiter admits having had more experience as an auditor than the other employees in the audit division and it was natural therefore that he would be given challenging tasks, but the tasks he was given and failed to complete were standard auditing tasks rather than the labors of Hercules. There were deadlines, but they were not rigid; so far as appears, had he reported progress they would have been extended. The likeliest inference from the facts developed in the summary judgment proceeding is that he was sulking because of having been transferred back to the audit division, losing the car and the freedom of an investigator. He admitted in his deposition that "he probably gave up" trying to satisfy his superiors' demands, though they appear to have been reasonable.

Although as we saw earlier Herrnreiter's transfer from the investigation division back to the audit division was not actionable, were there evidence that Odom made the transfer because of Herrnreiter's race or national origin this would be usable as evidence that Herrnreiter's subsequent termination by Odom was the second step of a two-step adverse employment action that was invidiously motivated. *Mathewson v. National Automatic Tool*

*Co.*, 807 F.2d 87, 91 (7th Cir. 1986); cf. *Oest v. Illinois Dept. of Corrections*, 240 F.3d 605, 613-14 (7th Cir. 2001); *Becker v. ARCO Chemical Co.*, 207 F.3d 176, 194 n. 8 (3d Cir. 2000). We do not agree with the defendant that this claim is blocked by the so-called "common actor" presumption. When the same person hires and later fires the employee who claims that his firing was discriminatory, judges are skeptical, because why would someone who disliked whites, or Germans, or members of some other group to be working for him have hired such a person in the first place? See, e.g., *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1147 (7th Cir. 1994); *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996); *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991). It is misleading to suggest (as some cases do, see, e.g., *Roberts v. Separators, Inc.*, 172 F.3d 448, 452 (7th Cir. 1999); *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 and n. 25 (5th Cir. 1996); *Blankerts v. V. Gladieux Enterprises*, 197 F. Supp. 2d 956, 961-62 (N.D. Ohio 2002); cf. *Bradley v. Harcourt, Brace & Co., supra*, 104 F.3d at 270-71) that this skepticism creates a "presumption" of nondiscrimination, as that would imply that the employee must meet it or lose his case. It is just something for the trier of fact to consider. See *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 291 n. 3 (7th Cir. 1999); *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 744-45 (7th Cir. 1999); *Waldron v. SL Industries, Inc.*, 56 F.3d 491, 496 n. 6 (3d Cir. 1995); cf. *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 361 (7th Cir. 2001). It is out of place in this case, because while Odom approved Herrnreiter's transfer to the investigation division, the transfer had been decided by Odom's predecessor and had actually taken place months before Odom's approval. That approval was only the weakest kind of evidence that he actually "wanted" Herrnreiter in investigations.

But Herrnreiter still must lose, as there is no evidence that his race or national origin played a role in his transfer back from investigations to audits. It is true that he

received a highly positive performance rating for his few months as an investigator. But appointing a person inexperienced in law enforcement to be an investigator was an experiment and there is irrefutable evidence that it failed because Herrnreiter did not have proper techniques for interviewing witnesses and did not mend his ways in response to criticisms and directives from his superiors. It is true that he was replaced by a black person when he was transferred, but it is also true that a black investigator terminated for unsatisfactory performance shortly after Herrnreiter's transfer was replaced by a white.

There is a further point. At argument, his lawyer had no opinion when asked whether, had Herrnreiter not been transferred to investigations in the first place but had remained in the audit division, Odom would have "set him up to fail." In other words, Herrnreiter's own lawyer is agnostic on whether, had it not been for the transfer, Herrnreiter would still be employed by the housing authority as an auditor despite his race and national origin. But if he would be, what improper motive could be assigned to Odom in firing him? None of the auditors was black when Herrnreiter rejoined the audit staff; and there is no evidence as to whether Herrnreiter was replaced and if so by a white or a black—while until Herrnreiter became an investigator, all the investigators were black. Even if we suppose that Odom wanted to keep the investigative staff all black and that's why he transferred Herrnreiter back to audits, Herrnreiter's lawyer does not argue that Odom wanted to change the racial composition of the audit staff and if this is so then Herrnreiter must indeed have been fired either because his performance was unsatisfactory or for some other reason unrelated to his race.

AFFIRMED.

No. 01-3202                                                    11

A true Copy:

          Teste:

                              _____
                              *Clerk of the United States Court of*
                              *Appeals for the Seventh Circuit*