In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-2074

JUDITH VOLOVSEK,

*Plaintiff-Appellant,*

v.

WISCONSIN DEPARTMENT OF AGRICULTURE,
TRADE AND CONSUMER PROTECTION,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Eastern Distrtict of Wisconsin.
No. 00-C-0550—**J.P. Stadtmueller**, *Judge.*

———————

ARGUED FEBRUARY 21, 2003—DECIDED SEPTEMBER 18, 2003

———————

Before CUDAHY, MANION, and ROVNER, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Judith Volovsek claims that she
should have been promoted in 1993 but was not because
she is a woman. In response to this, she filed a discrimina-
tion claim with the State of Wisconsin. The ongoing failure
of Volovsek to secure a promotion over the following five
years and her unhappiness with how she was being trained
and supervised led to two more administrative complaints
and, eventually, the present lawsuit under Title VII for sex
discrimination and retaliation. Volovsek appeals the grant
of summary judgment. She presents sufficient evidence of

discrimination with respect to the original 1993 denial of promotion to defeat summary judgment. The remaining claims were properly dismissed on summary judgment. We affirm in part and reverse in part.

I.

On August 12, 1991, Judith Volovsek began working for the Wisconsin Department of Agriculture, Trade and Consumer Protection (DATCP) as a Plant Industry Inspector. As such, she was responsible for inspection, enforcement and education activities relating to the regulation of agricultural treatments as well as storage and loading sites.

Soon after she began work, Volovsek's troubles began. She claims that she was required to move 25 miles to live within her work territory while two of her male colleagues, Robert McGregor and Mark McCloskey (the latter hired after Volovsek), were not required to move. Later during her first-year probationary period, Peter Helmbrecht, Volovsek's supervisor, allegedly made improper statements to her while in Volovsek's home for a training session. From the bathroom, Helmbrecht called out to Volovsek to "come in here and help me find it." During the same visit, Helmbrecht remarked to Volovsek, "I'll bet you are one of those women who climax every time," and "You know I don't get any sex at home." A male coworker corroborated these allegations, recalling Volovsek's contemporaneous reporting of this incident to him.

In June 1992, Volovsek's title changed to Agrichemical Specialist (ACS) as part of a departmental reorganization. The ACS position had three grade levels: Entry, Development and Objective. Volovsek began at the Entry level. According to the DATCP, promotion to a higher grade depended upon the employee's achieving a satisfactory level of knowledge, skill and independence. Therefore, positive

performance evaluations were critical to Volovsek's promotion to the next grade level. She eventually attained ACS-Development, but her unrealized goal was either ACS-Objective or Environmental Enforcement Specialist, discussed below.

During 1993, the DATCP assumed primary responsibility for agricultural pesticide spills from the Wisconsin Department of Natural Resources. As a result of the DATCP's new responsibility, it developed the Environmental Enforcement Specialist (EES) position, which was to handle the new responsibilities and which was compensated at several pay grades higher than an ACS. Volovsek and fourteen other ACSs applied for the EES positions.

On June 4, 1993, Ned Zuelsdorf, Bureau Director for the Agricultural Resource Management Division of the DATCP, met with Volovsek and told her that she had been rejected for the EES position, but could reapply when a position became available. Of those who applied, Volovsek and two men were not chosen for the EES positions. Eleven men were promoted to EES. The DATCP claimed that "Volovsek did not compete well" for the position. However, one male chosen for the EES position had less seniority than Volovsek and another had scored lower on the EES application test. Volovsek left the meeting with Zuelsdorf, but returned to request vacation time. Upon reentering the office, she overheard her supervisors, Helmbrecht and David Frederickson, talking about "keeping them barefoot and pregnant." Frederickson also asked her when she was leaving why she hadn't worn her Tyvex suit.[1]

---

[1] Tyvex is a white, chemically resistant, synthetic fabric used to protect its wearer from exposure to certain low-level environmental hazards. It often is used in the form of a loose-fitting, one-piece disposable suit that covers the wearer from head to toe.

Four days later, Volovsek wrote a memo to Zuelsdorf regarding their June 4th meeting, advising him that she believed that she was performing good quality work with duties that were equivalent to those of an EES, and that she should be considered for the EES position. Zuelsdorf responded by telling her that she required too much supervision, citing those inspections in January where she had been accompanied by Hagameier. Two days after Volovsek's memo, Hagameier informed her that Jack Darland, a fellow field inspector, was being given an assignment in her territory because she could not handle it. She was not allowed to work with Darland as is customary when an inspector is assigned to a colleague's territory.

Volovsek filed her first sex discrimination complaint with the Wisconsin Personnel Commission (WPC) on June 16, 1993 (1993 Complaint). The complaint cited both denial of promotion to ACS-Objective and denial of promotion to EES. Section 3 of the complaint notified complainants that unless they wrote "no," their complaint "may be filed with other agencies." Volovsek left section 3 blank thereby permitting WPC to file her complaint with other agencies. Sometime after the complaint was filed, Volovsek was promoted to ACS-Development where she remained until she was terminated in 1998.

Several instances of alleged discrimination or retaliation occurred subsequent to Volovsek's 1993 Complaint. In August 1993, a memo criticizing her work was placed in her personnel file without her knowledge. Later that year or in early 1994, Volovsek's colleague Robert McGregor overheard what he believed to be a conversation about Volovsek in which her supervisors were told to collect documentation against an employee. Volovsek alleges that soon after that discussion, criticism, conflicting advice and complaints for failing to perform functions that were outside the realm of her training ensued. Volovsek has provided evidence

(mostly in the form of her affidavit) disputing many of the negative performance evaluations and criticisms that she has received since 1994.

Also in 1994, a new DATCP policy required that ACSs work out of commercial office space instead of their homes. ACSs were permitted to choose their own office locations contingent upon Department of Administration approval. Volovsek submitted a memo to Frederickson with three potential locations, but Frederickson never forwarded the memo on to the Department of Administration. Volovsek argues that this was intentional, while the DATCP indicates that the lapse was a simple oversight. Subsequently, Volovsek was assigned an office 25 miles away from her home. However, she never worked in that office because she personally notified the Department of Administration of the space she had located less than a mile from her home.

A new policy also required that ACSs be issued desktop computers instead of the laptops they were currently using. The ACSs were instructed that, upon receipt of the desktops, the laptops should be returned. Volovsek contends that while awaiting her desktop, her supervisor, Luis Delgado, called and "berated her for not turning in her laptop."

Two additional events occurred in May 1995 leading up to Volovsek's second WPC complaint. First, the DATCP allegedly did not acknowledge on her annual performance review some of Volovsek's work that was completed during that review period (*i.e.*, public speaking and instruction she had performed). In addition, work summaries produced by the DATCP allegedly did not include all the hours she had worked. Volovsek argues that these were intentional omissions, but the DATCP claims that a change in the system for recording inspectors' summaries caused the omissions. The DATCP asserts that other employees were also affected and that the errors were promptly corrected. At her per-

formance review, Volovsek requested that Delgado promote her to ACS-Objective. Delgado replied, "Oh, so you can be bought."

The second event during that period was the issuance of a memo by Division Administrator Nicholas Neher to Volovsek, instructing her to discuss her cases only with her supervisors and not with other inspectors. This memo was not issued to any of Volovsek's colleagues, and another ACS stated that it is common procedure to communicate with other inspectors. Volovsek contends that this was an attempt to isolate her from her peers. After the memo had been issued, Volovsek alleges that she called the main office to discuss a work-related issue with a specialist, but the specialist refused to provide Volovsek with an answer. The DATCP insists that the memo was sent because Volovsek had received information from her peers that conflicted with instructions from her supervisors. The memo also noted the removal of three critical letters that Volovsek claims were improperly inserted in her file.

Volovsek filed her second sex discrimination charge with the WPC on May 23, 1995 (1995 Complaint), for the DATCP's failure to promote her to ACS-Objective and for her supervisor's negative performance evaluations. This complaint form contained a note section that invited complainants to check a box if they wanted the WPC to forward a copy of the complaint to the Equal Employment Opportunity Commission (EEOC). Volovsek checked that box, and it appears that this complaint was filed concurrently with the EEOC.

Soon after her second WPC charge, Volovsek contends that additional discriminatory and retaliatory incidents followed. She argues that her supervisors were intentionally not providing her with the training required to correctly perform her job. She also claims that the DATCP commenced a disciplinary proceeding against her for taking

samples at an inspection site even though this sample collection was mandated by DATCP policy. No action with respect to this matter was ever ultimately taken against Volovsek, but the DATCP refused to formally rescind the action.

Volovsek's performance evaluations from 1991 to 1995 stated that she was performing at or above job standards, but contained criticisms with respect to specific job performance issues and suggestions for improvement. Her June 1996 evaluation stated that, "[a]t a minimum[,] a technical college course in basic math would be a benefit to Judy." Nothing came of this comment for the next year. However, after her 1997 performance evaluation (which Volovsek refused to sign), Volovsek, as part of her training plan for the next year, suggested a technical math course.[2] In response, the DATCP administered a math test to see whether she needed a math course. Volovsek passed the math test with a 93 percent score. Following the exam, co-worker and Union Steward Kehrein spoke with Helmbrecht or Frederickson regarding a title reclassification for Volovsek since the math obstacle had been removed. The supervisor responded to Kehrein that the real problem was a lack of confidence in Volovsek's ability to work alone.

According to Volovsek, several more incidents occurred that led up to her third charge with the WPC. First, she asserts that the DATCP changed its EES position criteria

---

[2] The suggestion came about as a result of more contentious back-and-forth with Helmbrecht. Volovsek originally listed in her training plan that she would like "[a]ny and all training required to reach objective level of [ACS]." Helmbrecht informed her that a generic request for training was inappropriate, and after getting no concrete response from Volovsek suggested a communication course entitled, "Don't Eat the Menu." With her local Union Steward, Marty Kehrein, Volovsek then countered with her own suggestion of a technical math course.

to require a college degree. The DATCP denies this, saying it is strictly prohibited from doing so under Wis. Stat. § 230.14(3m). Second, she was asked to produce a personal training plan, a request that Steward Kehrein said was extremely unusual, and when she presented her plan, it was rejected. Third, Volovsek claims that the distribution of work was uneven such that she received more work than her colleagues. On February 10, 1997, she made another request for promotion to EES. The request was again denied. On April 1, 1997, Volovsek again requested a promotion to ACS-Objective, which was also denied. Four months later, Volovsek took a medical leave of absence for two months. On December 17, 1997, Volovsek filed a third sex discrimination and retaliation complaint with the WPC (1997 Complaint). Similar to the second WPC complaint, the third complaint also contained a section that invited complainants to check a box if they wanted the WPC to forward a copy of the complaint to the EEOC. Volovsek checked that box and the record appears to show that this complaint was also filed concurrently with the EEOC.

When the DATCP learned that Volovsek would not be returning to work in July 1998 based on her doctor's orders, it terminated her employment. Eleven months later, on June 19, 1999, the WPC denied Volovsek's first sex discrimination charge against the DATCP. Soon after, on August 27, 1999, her second charge was denied because the WPC found that the DATCP's actions were justified by the quality of Volovsek's work. Then, on April 14, 2000, the WPC dismissed her final charge against the DATCP due to an absence of probable cause. Volovsek received a Notice of Right To Sue letter from the EEOC dated January 18, 2000, regarding her 1995 Complaint.[3] On April 17, 2000, Volovsek

---

[3] The record also indicates that Volovsek requested a Notice of Right To Sue letter from the EEOC with respect to the 1997 Complaint. The record contains a preliminary letter to Volovsek

(continued...)

filed a sex discrimination and retaliation lawsuit in the Eastern District of Wisconsin.

Volovsek's district court complaint alleged that the failure to promote her and her negative performance reviews were motivated by sex discrimination and retaliation for her filing discrimination claims. The district court granted the defendant's motion for summary judgment, finding that sufficient direct or circumstantial evidence of a discriminatory motive was lacking. The district court also found that Volovsek did not make out a prima facie case under *McDonnell Douglas* because she did not show that she met the DATCP's legitimate performance expectations and did not identify a similarly situated male employee who was treated more favorably. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). As to the retaliation claim, the district court held that Volovsek did not establish a causal link between the DATCP's actions and Volovsek's filing of sexual discrimination complaints.

## II.

We review a district court's grant of summary judgment de novo, viewing the facts and drawing all reasonable inferences in the light most favorable to the non-moving party. *Stockett v. Muncie Indiana Transit Sys.*, 221 F.3d 997, 1000 (7th Cir. 2000). Summary judgment is appropriate only where "there is no genuine issue as to any material fact and

---

[3] (...continued)
dated October 20, 2000, indicating that the Department of Justice would be issuing a Notice of Right to Sue letter regarding the 1997 Complaint directly to Volovsek. However, the record does not contain the actual Right to Sue letter. But, the defendant has not contested its existence, and we consider any such argument waived.

. . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a).

### a.  *Scope of Volovsek's suit*

We start with some threshold questions about the scope of Volovsek's suit. Unfortunately we have to spend considerable time addressing this issue because the parties appear to have simply collected the sum total of all the unpleasant events in Volovsek's work history since 1991, dumped them into the legal mixing bowl of this lawsuit, set the Title VII-blender to puree and poured the resulting blob on the court.

The principal issue is chronology. As we noted at oral argument, Volovsek sweeps into her suit events ranging as far back as 1991. However, Title VII requires, as a precondition to suit, that charges be filed with the EEOC within 180 days after the "alleged unlawful employment practice occurred," unless the charges are first filed with a state agency that has the authority to grant relief from the "alleged unlawful employment practice," in which case the charges must be filed with the EEOC "within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice" that the state agency has terminated its proceedings, whichever is earlier. 42 U.S.C. § 2000e-5(e)(1). The WPC has jurisdiction over all charges covering the employment practices of the State of Wisconsin, except those alleging retaliation under § 704(a) of Title VII. *See* 29 C.F.R. § 1601.74(a) n.12.

Volovsek appears to have filed her 1995 and 1997 charges with the EEOC (as evidenced by the EEOC correspondence in the record). In the absence of any contradictory facts in the record or argument otherwise, we take as the date of the earliest EEOC filing the date of the filing of the parallel state charges, which were notarized as filed on May 23, 1995. Obviously this provides a very generous scope to the EEOC complaint and to the present case, since it presumes that the EEOC complaint was filed simultaneously with the WPC charges. The 1995 Complaint reaches back 300 days, to July 27, 1994, for the purposes of discrimination charges, and 180 days, to November 24, 1994, for the purposes of retaliation charges. This time frame, rigorously observed, would exclude the most important events detailed by Volovsek. There is no question that the most compelling facts described in this case involve the initial non-promotion to EES, accompanied by the inappropriate comments made to/about Volovsek during the roughly contemporaneous period. These events, however, are outside the statutorily available period for Volovsek's present action.

But the requirement that a plaintiff exhaust her administrative remedies by the filing of a timely EEOC complaint containing charges whose scope covers the claims in a subsequent district court complaint is merely a condition precedent to suit, not a jurisdictional requirement. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982); *Francis v. City of New York*, 235 F.3d 763, 766-67 (2d Cir. 2000); *Gibson v. West*, 201 F.3d 990, 993 (7th Cir. 2000). Therefore, the timing and scope requirements of an EEOC filing are subject to various equitable doctrines—most significantly in the present case, waiver. The record makes clear that Volovsek's 1995 and 1997 Complaints were filed with the EEOC. Those complaints (for whose specific substance we refer to the contemporaneous WPC complaints) include the failure to promote. As well, at both the district court and before this court, Volovsek has placed front

and center the events surrounding her failure to secure a promotion to EES when the position was first filled by ACS-level employees. The defendant's brief, however, does not argue that Volovsek is prevented from presenting these events because of a failure to exhaust her administrative remedies. In fact, the DATCP engages all of Volovsek's assorted allegations head-on. Therefore, any such exhaustion argument is waived.

Similarly, we have to take some time to sift and winnow all of the allegations in this suit and figure out which represent actionable claims of discrimination or retaliation. As the law says, we are looking for actions affecting the "compensation, terms, conditions, or privileges of employment," or, shorthand, materially adverse employment actions. 42 U.S.C. § 2000e-2(a). We need not look far for these. The core of Volovsek's case is the fact that, at various times between 1993 and 1998 she was denied promotions. The failure to promote is an adverse employment action with respect to discrimination and to retaliation claims. *Markel v. Bd. of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002).

Beyond the failure to promote, Volovsek has also alleged events that are of possible evidentiary relevance to the non-promotion. For example, for the 1993 non-promotion, the "barefoot and pregnant comment" is relevant.[4] Thereafter,

_____

[4]  Fredrickson also made the "Tyvex suit" comment at this time. Frankly, the inclusion of this comment in these arguments is somewhat baffling. At oral argument, the description given of such a suit's appearance matched what our own research has revealed: that such a suit is decidedly asexual, disguising the wearer's features and giving a generally androgynous appearance. Volovsek presents this evidence as a sexual comment, comparable, say, to Fredrickson asking her why she did not wear a bikini

(continued...)

we have the highly disputed performance reviews, the "you can be bought comment" by Delgado, the allegedly inadequate training, the denial of support and the math test Volovsek was administered. Additionally, relevant exclusively to Volovsek's retaliation claim, we have McGregor's allegation that he overheard Volovsek's supervisors discussing how to get rid of "her" and how to collect documentation to fire "her." All of these alleged events do not, themselves, amount to the kind of adverse employment action that constitutes discrimination or retaliation.[5] *See Stockett*, 221 F.3d at 1001 (defining an adverse employment action as a "materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities") (internal quotation omitted) (alteration in original); *see also Markel*, 276 F.3d at 911 (finding that a denial of "better" equipment or being removed from specific accounts that reduced the employee's bonuses did not constitute an adverse employment action); *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) ("[U]nfair reprimands or neg-

---

[4]  (...continued)
bathing suit. Although we have no idea why the "Tyvex suit" comment was made, we do not believe it has the connotation attributed to it by Volovsek.

[5]  Retaliation claims often take a more generous view of what events constitute actionable claims. For example, actions by an employer that are not clearly "employment" actions might support a claim of retaliation, the paradigmatic example being the employer who moves an employee's workspace into a closet in retaliation for a filed complaint. *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002); *see also Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 902 (7th Cir. 2003). However, none of the events described by Volovsek (beyond the non-promotions) constitute the kind of "significantly negative alteration in [her] workplace environment" that, in itself, would support a retaliation claim. *Herrnreiter*, 315 F.3d at 744.

ative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions."); *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) (finding that negative performance evaluations alone fail to satisfy the third prong of *McDonnell Douglas*); *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir. 1989) (finding increase in travel distance with job transfer not an adverse employment action under Age Discrimination in Employment Act). However, these facts may be evidence that supports Volovsek's claim that her non-promotion was the result of discrimination or retaliation because each event centers in some way around Volovsek's job performance, which was the grounds for refusing to promote her. Our focus is on the failure of DATCP to promote Volovsek.

The remaining events described in her brief constitute the kind of evidence of a hostile work environment that would normally be used to support a claim of sexual harassment. These events, which we will not detail, include Helmbrecht's alleged sexual comments to Volovsek and Delgado's allegedly improper berating of Volovsek for failing to turn in her computer. However, Volovsek has made no claim of sexual harassment, nor would the isolated and inconsistent nature of the acts alleged support such a claim. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462-63 (7th Cir. 2002) (explaining that "harassment must be so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment") (internal quotation omitted). And because none of these events itself constitutes an adverse employment action, nor bears any reasonable relation to the non-promotions (in either timing or content), the events are irrelevant to the disposition of this appeal.

Because most of the events in question occurred after Volovsek filed her first discrimination claim with the state, her discrimination and retaliation claims overlap signifi-

cantly. She acknowledges as much in her brief (and Second Amended Complaint) when, in the section on retaliation, Volovsek re-alleges the same discriminatory events that formed the bases of her discrimination claim.[6] Because of this overlap, we will consider Volovsek's discrimination and retaliation claims together for the analysis of post-1993 events.[7]

### b.  *Volovsek's direct method argument*

Volovsek can prove intentional sex discrimination and retaliation directly or indirectly. The direct method may employ either of two types of evidence: direct evidence and circumstantial evidence. The inevitable confusion of using the word "direct" to mean two different things aside, direct evidence is evidence, which, if believed by the finder of fact, "will prove the particular fact in question without reliance upon inference or presumption." *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997) (internal quotation omitted). This evidence of the I-am-not-promoting-you-

---

[6] The exception is a conclusory allegation in her brief that she was terminated in retaliation for her complaints. It appears clear that Volovsek was terminated for failing to return to work following a medical leave of absence. There is no merit to the inclusion of this claim. Even if the claim were colorable, the total absence of argument concerning this event would waive consideration of the issue. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) (explaining that perfunctory and undeveloped arguments are considered waived).

[7] The prima facie case for retaliation under the indirect method no longer requires the showing of a causal relationship between the accusation(s) of discrimination and the adverse employment action(s). *Stone v. Indianapolis*, 281 F.3d 640 (7th Cir. 2002). Therefore, with no differences that are relevant here, the same test applies in both retaliation and discrimination.

because-you-are-a-woman type is understandably rare. There is no evidence of this kind in the present case. The more common type of evidence is circumstantial evidence that allows a jury to infer intentional discrimination or retaliation. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Circumstantial evidence comes generally in three flavors: (1) suspicious timing, ambiguous statements, behavior towards other employees and so on; (2) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently, or (3) evidence that the employee was qualified for the promotion and passed over and the employer's reason for the difference in treatment is a pretext for discrimination. *Troupe v. May Dep't Stores*, 20 F.3d 734, 736 (7th Cir.1994). The third category bears an eerie similarity to the evidence required under the indirect method. *See Huff v. UARCO Inc.*, 122 F.3d 374, 380 (7th Cir. 1997).

With respect to the 1993 EES promotions, Volovsek presents evidence that 11 males were promoted, including one with less seniority and one who scored lower on the written test for the position. However, we note that the other two ACS-level employees failing to receive the promotion were men. After having left the meeting where she had been given the bad news that she was not to be promoted, Volovsek went back in to discuss another issue, and at that time she heard Helmbrecht and Fredrickson make the "keeping them barefoot and pregnant" comment.

This is Volovsek's strongest claim. A comment like "keeping them barefoot and pregnant," if true, is clearly derogatory towards working women. It suggests that the person making the comment does not want women in the workplace. Under our law, the comment alone would not be enough—it would be nothing more than another allegedly offensive stray comment towards Volovsek, but not actionable. *Schreiner v. Caterpillar, Inc.*, 250 F.3d 1096, 1099 (7th Cir. 2001) ("Stray workplace comments unrelated to the

alleged discriminatory employment decision are not sufficient to support an inference of discrimination."). What makes this confluence of facts difficult is that the remark here is so close in time and in substance to the alleged act of discrimination. *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). Volovsek allegedly overheard the comment being made by her supervisors just after having been told that she did not get the promotion she wanted. This is the kind of situation where such a comment could preclude summary judgment, and in the present case we believe it does. Volovsek's affidavit in which she recounts what she overheard is not, as the DATCP claims, conclusory or self-serving, as that term is commonly used in the context of summary judgment. She is relating facts of which she has personal knowledge in support of her claim of discrimination. *Payne v. Pauley*, __ F.3d __, 2003 WL 21540424, *5 (7th Cir. 2003) ("Provided that the evidence meets the usual requirements for evidence presented on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial—a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts."). This evidence goes directly to the heart of her claim that the failure to promote her was based on her sex. Whether this statement was actually made, and its import, is for a jury to decide. But there is an issue of material fact, and summary judgement on this claim was improperly granted.

Volovsek's remaining discrimination claims as well as her retaliation claims fail. The evidence fails to create, either individually or collectively, a "convincing mosaic of discrimination" sufficient to defeat summary judgment for DATCP. *Troupe*, 20 F.3d at 737. While the record supports the conclusion that Volovsek's relationship with her supervisors was troubled, it does not support the inference that she was

discriminated against on the basis of sex, and it is insufficient for making the *prima facie* case of intentional discrimination under the direct method. We address the evidence of the remaining claims below.

First, the EES position was filled through a competitive process, and the refusal to promote Volovsek (post-1993) when she requested such a promotion was based on the fact that no vacancies existed. Nor does Volovsek provide any evidence that would indicate that the perceived change in the EES prerequisites to include a college degree was an act of intentional sex discrimination against Volovsek. In fact, it is not clear at all that there was an actual change in prerequisites and not merely a mistake in the published notice. The isolated "can be bought" comment is not probative because it does not obviously or inferentially refer to sex or a sexual act. And it certainly seems unlikely that Delgado's comment, "you can be bought," meant that Volovsek could "buy" her promotion with sexual favors. Nor does Volovsek point us towards any evidence that male co-workers were given a promotion to ACS-Objective contemporaneously with her 1995 and 1997 requests for promotion. We cannot reasonably infer from this evidence that her failure to be promoted was the result of prohibited sex discrimination.

Similarly, the math test taken by Volovsek was a result of discussions about her training plan resulting from her June 5, 1997 performance review. From the record, it appears that Volovsek's refusal to name a specific course resulted in Helmbrecht's suggesting a communication course. Subsequent discussions resulted in Volovsek's choosing a math course, which the DATCP sought to replace instead with an evaluative test and customized follow-up training. No inference of discriminatory intent is possible from these facts.

Volovsek's workload was comparable to that of her co-workers for 1995, 1996, 1997 and 1998. And the DATCP

tries to explain, and Volovsek tries to rebut, the relevant negative performance reviews. There certainly is some question as to whether, or to what degree, Volovsek's job performance was in need of improvement. Similarly, it is not undisputed whether Volovsek received adequate training, or was denied credit by her supervisors for work performed. However, Volovsek does not provide us with evidence that would allow a jury to infer that these not atypical employer-employee conflicts, if true, were the result of illegal intentional discrimination against Volovsek on account of her sex.

The comments allegedly overheard by McGregor are probative, but inadequate. We would first have to infer that the supervisors were discussing Volovsek, which would not be too long an inferential leap given her status as the only woman they supervised. However, we would then have to find that it was reasonable to infer from this evidence that a non-promotion was motivated by discriminatory or retaliatory intent. Here we part ways with Volovsek. These comments were overheard not very long after Volovsek *had been promoted*, which would be an odd action to take with respect to someone you wanted to terminate. Additionally, there is no evidence that DATCP ever made any effort to fire Volovsek. And her performance evaluations, while indicating areas of substandard performance, continued to give her overall ratings at or above job standards for the next few years. Again, the comments do not appear connected to any alleged retaliatory act. McGregor did not overhear supervisors saying, "let's give her mediocre performance reviews, undermine her ability to work, refuse to promote her and be generally unpleasant to her so she finally gets fed up and quits," which is a more accurate description of the discrimination and retaliation claims made by Volovsek.

Volovsek has made out an adequate case under the direct method for the denial of her promotion in 1993 to defeat summary judgment. As to the events subsequent to 1993,

Volovsek fails to make out an adequate case under the direct method for either discrimination or retaliation.

c.   *Volovsek's indirect method argument*

The indirect method applies the familiar *McDonnell Douglas* framework to create a presumption of discrimination or retaliation in the absence of any direct or circumstantial evidence. *McDonnell Douglas*, 411 U.S. at 802. The plaintiff must establish that 1) she is a member of a protected class (or performed the protected act of filing a complaint), 2) she is qualified for the position or, if already employed, has met the defendant's legitimate work expectations, 3) the defendant took adverse employment action against her and 4) the defendants treated similarly situated employees outside of the protected class (or who did not complain) more favorably. *Johnson*, 325 F.3d at 897; *Stone*, 281 F.3d at 642. If these elements are established, the prima facie case of intentional discrimination is established and the burden shifts to the defendant to provide a nondiscriminatory reason for the employment action. *Id.* If the defendant successfully provides a nondiscriminatory reason, the presumption of discrimination disappears and the plaintiff must show that the articulated nondiscriminatory rationale is pretext. This means the plaintiff must show by a preponderance of the evidence that the proffered explanation is false and that "discrimination was the real reason" for the adverse employment action. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993). Because Volovsek has met her burden with respect to the 1993 denial of promotion, we limit our consideration in this section to the post-1993 denials of promotion.

It is undisputed that Volovsek is a member of a protected class, and that she engaged in the protected action of filing discrimination and retaliation complaints. As already mentioned, there is a legitimate issue as to whether Volovsek

met the DATCP's legitimate work expectations. Therefore, for the purposes of summary judgment we will presume that she did so. The failure to promote is an adverse employment action. Therefore, the relevant question for her prima facie case is whether similarly situated male co-workers were treated differently. Volovsek's claims, however, fail on this fourth prong (for both discrimination and retaliation) because Volovsek fails to provide evidence that DATCP promoted similarly situated men during the time period in question.[8] Therefore, because Volovsek fails to make out a prima facie case, we need not analyze whether the DATCP has rebutted Volovsek's case.

## III.

For the foregoing reasons, the judgment of the district court is AFFIRMED in part and REVERSED in part.

A true Copy:

  Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

---

[8]   With respect to retaliation, more precisely, Volovsek fails to present evidence that a similarly situated employee who did not file discrimination complaints was promoted.