# In the

# United States Court of Appeals

## For the Seventh Circuit

————————

No. 03-4136

KERRI A. MCKENZIE,

*Plaintiff-Appellant,*

v.

MILWAUKEE COUNTY, *et al.*,

*Defendants-Appellees.*

————————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 02-C-0325—**Rudolph T. Randa**, *Chief Judge.*

————————

ARGUED APRIL 6, 2004—DECIDED AUGUST 23, 2004

————————

Before RIPPLE, KANNE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Kerri A. McKenzie, a Milwaukee County sheriff's deputy, sued her employer alleging employment discrimination and violations of her Equal Protection and First Amendment rights. The district court granted summary judgment to her employer, and McKenzie appeals. We affirm.

Because this case comes to us on review of summary judgment, we view the facts in the record and all inferences from those facts in the light most favorable to McKenzie. *See Sullivan v. Ramirez*, 360 F.3d 692, 696 (7th Cir. 2004). McKenzie became a sheriff's deputy in 1994 and was assigned

to guard duty at the county jail. In 1999 she was reassigned to the Drug Enforcement Unit, where she worked as an undercover detective investigating drug crimes. The Drug Enforcement Unit was part of the Criminal Investigation Bureau ("CIB"), which in 2000 became headed by George Paras, an experienced narcotics officer who was known as a demanding boss. Paras was also part of a clique known as the "good old boys"; he used this network to reward those he liked and ostracize those he disliked. McKenzie had been friends with Paras's predecessor, Joe Delaney, who did not get along with Paras, and she feared Paras might hold this against her. She had a "gut feeling" that she might encounter trouble with Paras, so she decided to keep a diary documenting all of their interactions. Shortly after he started, Paras commented to McKenzie and a male officer that "they would be on the next transfer list" if they did not immediately greet him when he walked into the office. The male officer interpreted Paras's comments as a joke, but McKenzie did not.

At the time that Paras took charge of the bureau, McKenzie was the lead investigator in a large-scale undercover drug investigation. Paras began to develop numerous concerns about the case, including the pace of the investigation, which began several months earlier. He was also concerned that the case depended heavily on a sole informant, and that the main target was from Mexico, making him a flight risk. In January 2001 Paras called a meeting to discuss the status of the investigation, during which he questioned McKenzie about the case. McKenzie viewed the meeting as essentially a "firing squad" intended to embarrass her and undermine her authority. At the end of the meeting, Paras told McKenzie to focus all of her time on the investigation, and he also assigned two experienced narcotics officers to assist her. Shortly after this meeting, Paras, who was terminally ill with bone cancer, began missing a considerable amount of work, and he and McKenzie had little direct contact for the next four months.

In May 2001 Paras called another meeting to discuss the status of McKenzie's investigation. McKenzie decided to secretly tape-record the meeting because she had heard rumors that Paras was impatient that the investigation had not yet been completed. During the meeting, McKenzie reported her progress on the case, and Paras and other officers asked her questions. At one point during the meeting, Paras told McKenzie, who was standing during her presentation, to sit down. She said "no." Viewing Paras's questions as another attempt to undermine her authority over the investigation, she told him that the case was hers and that she was passionate about it. Paras again told her to sit down, and she complied.

After the meeting, Paras informed Captain Rodney Richards that he wanted McKenzie reassigned. Paras was angry about her conduct during the meeting because he viewed it as disrespectful, and he also believed that she was not properly handling the undercover investigation. Richards talked Paras out of reassigning McKenzie until the investigation was completed. Later that day, Richards talked with McKenzie about the incident at the meeting. He stated that he did not know what the "problem" was between McKenzie and Paras. He said, "I don't know if it's a gender thing, I don't know if it's a blonde thing, I don't know if it's a Joe Delaney thing"— referring to Paras's predecessor. McKenzie responded that she had been "on the defensive" during the meeting because she thought she was not getting the same respect as her male colleagues. She stated that she had no "bone to pick" with Paras and that she wanted simply to be left alone to do her job. Richards told her to stay focused on her case and avoid challenging Paras.

A few days later Paras met with both McKenzie and her sergeant, Fred Hagedorn, and told her that he was upset about her conduct during the meeting. He explained that he thought she had been uncooperative ever since he took charge of the bureau, and added that if she had spoken to

other command staff the way she spoke to him during the meeting, she would have had her "head handed to her." Paras then left, and McKenzie continued to discuss the issue with Sergeant Hagedorn, telling him of her concern that Paras disliked her because she was a female overseeing a large investigation. At one point Hagedorn stated, "George thinks women are only good for fucking."[1] The meeting concluded with Hagedorn telling McKenzie that Paras would not "be around forever."

In June 2001 McKenzie's undercover investigation came to fruition, and several suspects were arrested. Officers also seized a kilogram of cocaine and several vehicles. When McKenzie returned to the office after the arrests, Paras congratulated her and told her she did a good job, but she perceived his comments to be "sarcastic" and "half-hearted."

On August 7, 2001, Captain Richards informed McKenzie that she was being transferred to the patrol bureau. When she asked why, Richards replied that Paras believed she had a "poor attitude." McKenzie stated that she had been treated unfairly and told Richards that she had been keeping a "book" on the events of the past few months, gesturing with her index finger and thumb that the book was about an inch thick. Richards asked if he was in the book, and McKenzie replied that he and numerous other command staff were mentioned in the book. Richards became angry, believing that McKenzie was trying to threaten or intimidate him into reconsidering her transfer.

The following day, Richards conveyed the incident to Paras, who then met with McKenzie and asked her about the book. She responded that she did not have it with her but that it

---

[1] Hagedorn disputed that he made this comment, asserting that it was in fact McKenzie's statement. For the purposes of summary judgment, the defendants adopted McKenzie's version of the meeting.

was "somewhat of a daybook" detailing her interactions with various staff during the past six months. Paras immediately walked McKenzie down to the Office of Professional Standards, where she was interviewed by two officers about the book. During the interview, she did not reveal the precise contents of the book except to characterize it as a "personal diary" containing information about her personal life.

Upon returning to her office, she was told that due to her transfer she was required to turn in her weapon, cell phone, pager, and the keys to her undercover vehicle. Another officer escorted her through the office while she closed her files and gathered her belongings, but she was not permitted to retrieve any personal items from her vehicle. On her way out of the office, McKenzie met with Sheriff Leverett Baldwin, who asked her about the book she had been keeping. She replied that the book was essentially a "personal diary." Sheriff Baldwin told McKenzie that he understood she wanted to be reassigned to the "courts and auxiliary" bureau. She replied that she would prefer to be transferred to another area within the detective bureau, but Sheriff Baldwin stated, "That's not an option for you." He told her that if she wanted to go to courts, she would be reassigned to courts, and that the transfer was effective immediately. McKenzie ultimately received a written reprimand for her conduct during the meeting with Captain Richards, because officials concluded that she had mentioned the book to Richards in an attempt to intimidate or coerce him into allowing her to stay in the drug unit.

After obtaining a right-to-sue letter from the U.S. Equal Employment Opportunity Commission, McKenzie in April 2002 filed a complaint against Milwaukee County, Sheriff Baldwin, Paras (by that time deceased), Richards, and Hagedorn. She raised hostile work environment and disparate treatment claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; an Equal Protection claim also based on gender discrimination; and a First

Amendment claim alleging unlawful retaliation based on her speech, namely, the book she kept detailing her workplace interactions.

The district court granted summary judgment to the defendants on each claim. As for her Title VII claims, the court determined that McKenzie failed to establish that her work environment was objectively hostile or that she suffered a materially adverse employment action. For the same reasons, her Equal Protection claim also failed. As for her First Amendment claim, the court concluded that McKenzie's book was not constitutionally protected, nor was it a motivating factor in the decision to reassign her, since she was notified of her reassignment before she ever revealed the existence of the book to her superiors. The court accordingly awarded summary judgment to the defendants.

We review the district court's grant of summary judgment de novo. *Volovsek v. Wis. Dep't of Agr., Trade & Consumer Prot.*, 344 F.3d 680, 686 (7th Cir. 2003). Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Volovsek*, 344 F.3d at 686.

To establish a claim of hostile work environment, McKenzie must show that she was subjected to harassment so severe or pervasive that it altered the conditions of her employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998); *Twisdale v. Snow*, 325 F.3d 950, 953 (7th Cir. 2003). She must also demonstrate that her workplace was both subjectively and objectively hostile. *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 693 (7th Cir. 2001). On appeal, McKenzie argues that the district court erred in concluding that her work environment was not objectively hostile, asserting that Paras's conduct made her work life "hellish." We must determine whether a reasonable person would find

McKenzie's workplace hostile or abusive, looking to all of the surrounding circumstances, including whether the discriminatory conduct was frequent or severe; whether the conduct was physically threatening or humiliating; and whether the conduct unreasonably interfered with her work performance. *Id.* We have made clear that Title VII is not a general code of workplace civility, nor does it mandate "admirable behavior" from employers. *Id.*

The facts McKenzie points to in support of her claim fall short of establishing an objectively hostile or abusive work environment. Several of the incidents involved other female employees of the sheriff's office, and the impact of such "second-hand" harassment is not as great as harassment directed at McKenzie herself. *See Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997). The incidents involving McKenzie consisted mainly of occasions where Paras failed to greet her or acted "standoffish," "unfriendly," and "unapproachable"—none of which establishes an objectively hostile work environment. *See Patton v. Ind. Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (claims that supervisor was rude, abrupt and arrogant, ignored employee's suggestions, and failed to inform employee about changes at work did not establish hostile work environment); *see also Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 858 (7th Cir. 1999) ("It is not enough that a supervisor . . . fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor.") One of the comments McKenzie points to— "George thinks women are only good for fucking"—is indeed offensive, but this isolated comment is insufficient to establish severe or pervasive harassment. *See Patt*, 280 F.3d at 754; *Adusumilli v. City of Chicago*, 164 F.3d 353, 356 (7th Cir. 1998).

McKenzie's other evidence pertains to Paras's oversight of her undercover investigation, including his apparent disinterest in her case; his frequent inquiries as to when the

investigation would be completed; his threats to have another law enforcement agency take over the case; and his status meetings, which she viewed as "firing squads." None of these circumstances suggest any inkling of harassment based on McKenzie's gender, and inappropriate workplace conduct (assuming Paras's actions could be characterized as such) that is not based on gender is outside the ambit of Title VII. *See Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 810-11 (7th Cir. 2001); *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999). At most, the record shows a personality clash between Paras, a demanding boss, and McKenzie, his less-experienced subordinate, who was running an important investigation. The record also suggests that Paras used his "good old boy" network to favor those he liked and ostracize those he disliked—both men and women. Because McKenzie failed to establish that she suffered severe or pervasive harassment based on her gender, the district court correctly entered summary judgment in favor of the defendants on this claim.

Turning to McKenzie's Title VII disparate treatment claim, she must show, among other elements, that she suffered an adverse employment action. *See Tart v. Ill. Power Co.*, 366 F.3d 461, 472-73 (7th Cir. 2004); *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 743-44 (7th Cir. 2002). Adverse employment actions include a broad array of actions such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or some other action causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). To be actionable, an employment action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002). The district court concluded that McKenzie failed to make out an adverse employment action because the most she could show was a lateral transfer without any change in pay or benefits.

On appeal, McKenzie argues that her transfer was in fact a demotion. She suggests that her reassignment constituted an adverse employment action because "she was reassigned from somewhere she wanted to work," but, as we have held, a transfer does not become an adverse employment action solely because the employee subjectively prefers one position over another. *Herrnreiter*, 315 F.3d at 745. The record shows that sheriff's deputies are frequently reassigned during the course of their careers, and McKenzie's transfer allowed her to maintain the same pay and benefits.[2] Although her new assignment did not involve undercover work, she remained a sheriff's deputy, and the two positions "were equivalent other than in idiosyncratic terms that do not justify trundling out the heavy artillery of federal discrimination law." *Id.* Even assuming McKenzie could establish that she suffered an adverse employment action, she also failed to identify a similarly situated male officer—one running a large-scale investigation under Paras's supervision—who was treated more favorably than she was. *See Volovsek*, 344 F.3d at 692. Accordingly, the district court properly granted summary judgment to the defendants on McKenzie's disparate treatment claim. For the same reasons, McKenzie's discrimination claim brought under the Equal Protection Clause also fails. *See Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1036 (7th Cir. 2003) (same standards for proving discrimination apply to Title VII and equal protection claims).

---

[2] McKenzie's suggestion that the transfer was a demotion because "[d]etectives working in CIB were supposed to get 50 cents an hour more than deputies" is not borne out by the record. A collective bargaining agreement included in the record shows that certain listed employees—longtime officers assigned to the detective bureau—were to receive an additional 50 cents an hour, but McKenzie's name was not on that list. Further, McKenzie admitted during the proceedings in the district court that she received no reduction in pay when she was transferred out of the detective bureau.

We turn then to McKenzie's First Amendment claim. The precise contours of this claim are unclear, but McKenzie appears to assert that the defendants improperly "demoted" her in retaliation for exercising her free speech rights, specifically, maintaining a journal that documented the harassment she had suffered. To establish a First Amendment retaliation claim, McKenzie must show, among other elements, that she engaged in constitutionally protected speech, and to do so she must establish that her speech pertained to a matter of public concern. *See Sullivan*, 360 F.3d at 696-97. In determining whether a government employee's speech addresses a matter of public concern, we look to the speech's content, form, and context as revealed by the record as a whole. *Id.* The speech must relate to a community concern rather than "merely a personal grievance of interest only to the employee," and so complaints about personnel matters generally are not constitutionally protected. *Id.* at 699.

On appeal McKenzie offers only a cursory argument to refute the district court's conclusion that her journal related to a personal grievance rather than a matter of public concern. She suggests that *any* speech pertaining to sexual harassment is per se a public concern. Sexual harassment is indeed an important matter, but not all speech relating to sexual harassment enjoys constitutional protection. *See Hartman v. Bd. of Trust. of Comm. Coll. Dist. No. 508*, 4 F.3d 465, 471 (7th Cir. 1993). Rather, we must look to the speech's content, form, and context. Here, McKenzie's speech consisted of privately recorded notations in a book she herself characterized as a "personal diary" or "daybook" detailing her interactions at work and her personal life. When asked by her superiors, she balked at producing the book or revealing its exact contents. Further, McKenzie suggests that her motive in mentioning the book was to bring Paras's wrongdoing to light, but when asked by her superiors, she stated that she did not know why she revealed the existence of the

book. The sheriff's department reprimanded McKenzie because it concluded that she was using the book to intimidate her superiors into reconsidering her transfer. In light of these facts, the district court correctly concluded that McKenzie's book was an expression of personal rather than public concern, and therefore was not entitled to constitutional protection. *See Sullivan*, 360 F.3d at 700.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*