# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-2236

LAMARCE TART and DAVID CURTIS,

*Plaintiffs-Appellants*,

v.

ILLINOIS POWER COMPANY and
RAULY LAW,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Illinois.
No. 98 C 715—**Clifford J. Proud**, *Magistrate Judge*.

_____

ARGUED DECEMBER 9, 2003—DECIDED APRIL 26, 2004

_____

Before FLAUM, *Chief Judge*, and BAUER and ROVNER,
*Circuit Judges*.

ROVNER, *Circuit Judge*. Lamarce Tart and David Curtis
prevailed before a jury on their claims of race-based
employment discrimination and retaliation. The district
court subsequently granted the defendants' Rule 50 motion
for judgment as a matter of law, vacating the jury's verdict.
Once a jury has spoken, we are obliged to construe the facts
in favor of the parties who prevailed under the verdict.
*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133,

150-51 (2000). Because the district court[1] construed several key facts in favor of the losing parties, and because a reasonable jury could (and indeed did) find that the defendants took adverse employment actions against the plaintiffs because of their race and retaliated against them for engaging in protected activity, we reverse and remand with directions to reinstate the jury's verdict in favor of the plaintiffs.

## I.

We begin with a view of the facts that favors the winning plaintiffs as we are required to do under existing law. David Curtis, who is African-American, began working at the East St. Louis plant of Illinois Power in 1979. Tr. Vol. II, at 10. He received positive performance reviews throughout his career there and was selected to train other employees because of his skills. Tr. Vol. II, at 18-20; Tr. Vol. III, at 190-91; Pl. Ex. 18. For many years, he worked in a one-man truck responding to customer service calls. Tr. Vol. II, at 11-12. In 1988 or 1989, he also began working in the meter shop, an indoor position that involved maintaining and testing gas meters and other equipment used to measure gas and detect and repair gas leaks. Tr. Vol. II, at 13-15. He continued to respond to customer calls in a one-man truck and he performed maintenance services around the building itself, completing wiring, plumbing, air-conditioning and heating repairs. Tr. Vol. II, at 15-16. His position changed titles over the years but he remained essentially what is now known as a gas journeyman. After the events that took

---

[1] The parties consented to allow a magistrate to conduct all proceedings including the trial of the case pursuant to 28 U.S.C. § 636(c). *See* R. 60. The case was referred to Magistrate Judge Clifford J. Proud. *See* R. 61. We will refer to the court below as the district court for ease of understanding.

place in this case, he obtained the additional status of "lead man," which makes him eligible to be in charge on a two-man truck. Tr. Vol. II, at 10-11.

Lamarce Tart is also African-American. He too is a gas journeyman. He began working for Illinois Power in East St. Louis in 1981. Tr. Vol. II, at 196. He, like Curtis, received positive performance reviews over the years. Pl. Ex. 17. Prior to these events, he worked in a one-man truck responding to customer service calls and greatly enjoyed his work. Tr. Vol. II, at 197-98. In the one-man truck he had contact with customers, was his own boss, made his own decisions and was not subordinate to a lead man (as was the case with two-man trucks). Tr. Vol. II., at 198. Like Curtis, he engaged in skilled work locating and repairing gas leaks both inside and outside of customers' homes.

Both men worked at Illinois Power without incident until 1996 when Rauly Law, one of the defendants in this case, became the new plant manager. Law is Caucasian. At that time, although the plant workforce was half African-American and half Caucasian, all of the supervisors and managers were Caucasian. Tr. Vol. II, at 24. In 1996, after Law came on board, a Caucasian employee named Reginald Briggs began harassing Curtis, threatening him, swearing at him and roughhousing. Briggs called Curtis a thief, accused him of stealing time from the company, and accused him of harming the employees' position with the union. Tr. Vol. II, at 24-28. Curtis approached Law and asked him to intervene but Law did not respond to this request. Tr. Vol. II, at 28. Instead, Law told Curtis he was going to keep a close eye on him, that he would be watching Curtis and his work performance, and he began to call into question the validity of Curtis's time sheets. Tr. Vol. II, at 29-30.

Law also turned away from a verbal altercation in which Briggs yelled at Curtis for taking a company truck home, an

action Briggs claimed was unethical. Tr. Vol. II, at 32-33. Briggs, of course, was Curtis's co-worker, not his supervisor, and Curtis explained that the company allowed employees to take trucks home when they were serving as "first responders." Tr. Vol. II, at 33-34. Law came out of his office to observe the commotion, saw it escalating and returned to his office. *Id.* In the course of this diatribe, Briggs accused Curtis of having previously taken a truck home in an incident that occurred some twelve years earlier. Curtis remarked that he was vindicated in the earlier incident, which occurred in conjunction with a plant where African-American employees were not allowed to have a key to the facility and were not allowed to respond to customer calls in that particular geographic area, a situation which existed until Curtis complained. Briggs accused Curtis of trying to turn the conversation into a racial issue. Curtis replied that it was a racial issue. Tr. Vol. II, at 33-34.

Briggs also harassed Lamarce Tart. As described by Curtis, one incident included Briggs "yelling and screaming at Mr. Tart and giving him his middle finger and giving him a general cuffing" all in the presence of Law. Tr. Vol. II, at 36-37, 199-200. When Tart asked Law to intervene and force Briggs to apologize, Law declined. Tr. Vol. II, at 200-01. After witnessing this exchange and having suffered at Briggs's hands himself, Curtis decided to call the company's human resources division in Decatur, Illinois. He spoke to Ken Justice, an Illinois Power human resources consultant, and told him that he and Tart were being treated "with a biasness [sic] by Mr. Law, and we had been attacked and harassed by a white individual and his actions were being substantiated by Mr. Law." Tr. Vol II, at 36-37; Tr. Vol. II. at 156 ("I told him that it was biased, and that's the term I used. He understood what I was saying. He knew I was talking about race."). He explained that by "substantiated" he meant that Law had "done absolutely nothing to curtail" Briggs's actions. Tr. Vol. II, at 37. Justice promised to look into the situation.

Shortly thereafter, Law called the plant together to "flush the birdie" because "somebody done called EEOC." Tr. Vol. II, at 40. Law was irate that "somebody called the EEOC or the employee services," that someone "blew the whistle" and he did not want employee services coming to investigate. Tr. Vol. II, at 40. Curtis admitted it was he who had made the call to Human Resources. He was confused by Law's reference to the EEOC and told him he did not know he had called the EEOC but thought he was talking to the company's employee services. Law responded, "That's them, then you did do it." Tr. Vol II, at 41.

Law next called a weekend meeting of Curtis, Tart, Briggs and a union representative, David DeGonia. At this meeting, Law told Curtis that to prevent employee services from coming down, Curtis would have to say he made a mistake in calling them or that he did not need their services. Tr. Vol. II, at 42. Law told Curtis that Justice was coming down to East St. Louis on Monday unless they could get the issue resolved without him. Tr. Vol. II, at 43. He told Curtis that "if they do come down, someone is going to be without a job." Tr. Vol. II, at 42, 202-03. Because he was looking directly at Curtis when he threatened the job loss, Curtis assumed Law meant that Curtis would be fired. From this point on, Curtis feared for his job. Tart too understood his job to be on the line. Tr. Vol. II, at 203. That weekend, Curtis called Law to apologize for calling Human Resources, explaining he did not know it was going to be "such a big deal." Tr. Vol. II, at 43. Law told him that "somebody was going to have to be fired if that guy has to come down. . . . And, David, you're the only guy that we're having a problem with." Tr. Vol. II, at 43.

On Monday morning, Law called another meeting of Curtis, Tart, Briggs and the union steward. At the meeting, Law asked Curtis if the issue was resolved. Curtis replied it was not. Law then asked if Curtis had a problem working with Briggs; Curtis said he did not. Law asked Briggs if he

had a problem working with Curtis and he replied he did not. Law declared the matter resolved. Tr. Vol. II, at 44. Human Resources did not come down to East St. Louis to investigate at that time. Thereafter, Briggs continued to harass Curtis, and Law continued to scrutinize Curtis's work. Curtis tolerated the situation until the Loisel Drive incident.

On appeal, the defendants characterize the Loisel Drive job as "mishandled" but a reading of the record that favors the prevailing plaintiffs reveals that many factors beyond the plaintiffs' control contributed to the length of time they were at the site. Although the plaintiffs were working on one-man trucks and, in Curtis's case, in the meter shop at that time, the union had negotiated a requirement that after regular working hours in certain geographical areas, a minimum of two workers were required to respond to customer calls for safety reasons. This is how Curtis and Tart came to respond together to the report of a gas leak at Loisel Drive in October 1997.

The call came in on a weekend afternoon, and Curtis and Tart reported to the plant within an hour as required. There they picked up a truck and proceeded to the site, where another Illinois Power employee waited for them. He told them the leak was "first class," the most dangerous type of gas leak situation. Tr. Vol. II, at 45. The leak was at the homeowner's foundation wall, which created a risk that gas could infiltrate the foundation and cause a fire or explosion. The homeowner was a wheelchair-bound paraplegic. Curtis and Tart realized that they did not have adequate equipment on their truck to handle a leak of this type. They made a temporary fix that rendered the situation safe enough to leave to get additional equipment, and then made the 40 minute round trip to the plant to get a better equipped truck. The trip back to the plant was lengthened by the fact that it was a weekend, the plant was empty and some of the equipment they needed was locked

in a storehouse. Once they returned to the home, the company dispatcher called a joint utility locating company to come out and mark the location of underground utility lines before they started digging. Tr. Vol. II, at 50-52. Although the locating service is usually able to pinpoint electrical and gas lines, it is not able to detect buried sewer lines. Because the service cannot predict the location of sewer lines, hitting and breaking sewer lines when digging is a known risk of the job in gas line repair. Tr. Vol. II, at 52-53, 194, 205. Even the defendants conceded this. Tr. Vol. III, at 70-71. Breaking a sewer line while digging is a common occurrence and no one had ever been disciplined or reprimanded for hitting a sewer line. Tr. Vol. II, at 59.

The locator service technician arrived a little more than an hour after Illinois Power dispatch called for help. The technician was new to the job and was having difficulty using the computerized mapping system to find the service lines. Tr. Vol. II, at 54. Indeed, he was unable to locate even the gas line much less the electrical and other service lines. After realizing that their guess was as good as the technician's, Curtis and Tart were ready to dig. By this time, though, it was getting dark. They again returned to the plant, another 40 minute round trip, to pick up lighting equipment. As luck would have it, the sewer line was located very close to the gas line that required replacement. While digging for the gas line, Curtis and Tart struck and broke the sewer line. This too lengthened the job because the trench in which they had to work was now filled with leaking sewage. Nonetheless, they succeeded in replacing the gas service line in approximately seven hours, plus the time needed for trips back to the plant for equipment. Tr. Vol. II, at 59.

Because the homeowner was a paraplegic and they did not want to leave her without a working sewage system, they decided to fix the broken sewer line, a common practice for gas journeymen. Tr. Vol. II, at 61. They once again

traveled back to the plant to obtain materials to fix the sewer line, returned to the home and completed the repairs. When attempting to refill the hole they had dug to expose the gas line, the hydraulic line of their digging equipment burst and sprayed hydraulic fluid all over them. Tr. Vol. II, at 60. Because of this equipment malfunction, they were unable to completely refill the trench, and left that work for another crew the next day. Tr. Vol. II, at 61. All in all, they worked for approximately eighteen hours to complete the job, taking breaks as they were entitled to do under union rules. Tr. Vol. II, at 60-61.

On Monday, they returned to work and Law called them in to question them about the job. Law was making good on his threat to scrutinize their work, and he asked for an accounting of all the hours they spent on the job. They described the work to him, including the darkness, the equipment problems, the sewer line breakage and other unfavorable conditions. Tr. Vol. II, at 62-63. Law acknowledged the difficulties and told them he had no problem with the job. Tr. Vol. II, at 209.

A few days later, Law called them in again, and this time he was displeased with their work on the Loisel Drive job. He told them they were at the site for an unreasonably long time, that he was suspending them for one day and taking away their overtime pay. Tr. Vol. II, at 209-10. He removed Curtis from the meter shop and took away his mobile data terminal, a laptop computer Curtis used in his work. Tr. Vol. II, at 63-65. He also took back from Curtis keys to the meter shop and company credit cards that Curtis had been using to procure materials for maintenance of the building and to purchase small tools associated with the job. Tr. Vol. III, at 76-77. Law assigned Curtis to a two-man truck for "training" under Frank Verdu, a less experienced employee whom Curtis himself had trained. Tr. Vol. II, at 63-65. This two-man truck was not assigned to customer service calls. As Curtis explained, his job suddenly changed drastically:

> Frank Verdu had been an individual of lesser years than I, and he was still out in what's called ditch work or construction work. I was in an office, and I had a computer on my desk, and I was in charge of a data base of meter inventorying, sensitive gas leaks, search equipment that I was responsible for repairing and maintenance of. I often went in and helped the girls in the office with their computer situation. All of a sudden I was just not the person to be doing that anymore.

Tr. Vol. II, at 66. Curtis suddenly found himself outdoors in the winter digging ditches under the command of a man he had previously trained.

Verdu was just as puzzled by the new assignment as Curtis. When Law assigned Curtis to him, Law said, "nobody else would take him, so you're getting him." Tr. Vol. II, at 182. Verdu had been trained by Curtis and protested that he could not train the man who had trained him because Curtis already knew everything Verdu knew. Tr. Vol. II, at 182, 185-86. In fact, no one ever told him he was supposed to train Curtis. Tr. Vol. II, at 183. No one told him why Curtis was assigned to him or ever asked him how Curtis was progressing in his supposed training. Tr. Vol. II, at 185. *See also* Tr. Vol. II, at 182 (where Verdu testified, "No, it wasn't anything about training him, because I couldn't train him."). Indeed, the only thing Law said to him about Curtis was a cryptic statement Verdu understood to mean that Law wanted Verdu to work Curtis until he quit. Tr. Vol. II, at 187. Two other employees, Reginald Briggs and Ron Kelly, also told Verdu that he was supposed to work Curtis until he quit. Tr. Vol. II, at 189.

At the end of the reassignment meeting, Tart and Law exchanged words and Tart left the office, unintentionally shutting the door hard behind him. Tr. Vol. II, at 67-68. Law jumped up from his chair and pursued Tart with such speed that Curtis feared he was going to "head butt" Tart.

Tart turned to apologize for shutting the door firmly and Law yelled at him in a threatening fashion. Curtis feared Law was going to assault Tart. Tart himself asked Law if he was going to hit him. Law responded, "If I was going to hit you, I would have done hit you." Tr. Vol. II, at 69-70, 211.

Curtis and Tart grieved the discipline and as a result their overtime pay was reinstated but the union declined to address the reassignment to ditch-digging duties. Tr. Vol. II, at 70. Curtis and Tart called Human Resources in Decatur to complain about the discipline. Curtis spoke to Ken Justice again and also to Linda Edwards, telling them there were racial problems in the East St. Louis plant. Tr. Vol. II, at 177 ("I told him the work force was dividing along racial lines[.]"). Edwards was also a Human Resources consultant, a management level position at Illinois Power. Tr. Vol. III, at 27.[2] Justice and Edwards were surprised to learn that there was an ongoing issue that stemmed from the earlier call, and felt they had been deceived. Tr. Vol. II, at 71-72. Curtis told Edwards that "there was a racial problem that had developed there, and that the issues that stemmed from 1996 had not been re-solved, and in fact that the reason they didn't get the evidence, what was taking place there, is because I had been threatened to lose my job if I didn't say it was re-solved." Tr. Vol. II, at 74. He told Edwards that he had been removed from his primary, routine duties and that the actions had gone beyond discipline and had become vindic-tive and a punishment. Tr. Vol. II, at 74, 79. Tart told Edwards that he had been subjected to discrimination and retaliation since November 1996, that the things that were happening to him were not happening to white employees. Indeed, the Caucasian supervisor and dispatcher involved

---

[2]   Edwards was eventually promoted to the position of manager of diversity, affirmative action and EEOC. Tr. Vol. III, at 27. She later left the company.

in the Loisel Drive job were not disciplined or trained in any manner following the incident. Tr. Vol. II, at 215-16.

Edwards assured Curtis that he had done nothing wrong in calling Human Resources the previous year. She also agreed that the reassignment was punishment, and that no other employee had been trained or disciplined in this manner. Tr. Vol. II, at 79-80. Verdu later agreed that no employee had ever been disciplined for taking longer to complete a job than they should have. Tr. Vol. II, at 188. David DeGonia, the union representative, had never heard of anyone who was not an apprentice being sent out for training for five or seven months. Tr. Vol. III, at 172. Edwards conducted an investigation that began with interviewing the four people most immediately involved: Curtis, Tart, Law and Briggs. Eventually the investigation expanded to include eighteen other employees who came forward on their own to talk to her. Tr. Vol. III, at 31. Edwards drafted a twenty-page memorandum detailing the investigative interviews and listing her findings and recommendations. Pl. Ex. 7. This report was presented to the jury in redacted form as Exhibit 7A. In redacted form, the report contained interview summaries from Curtis, Tart, Law and Briggs. It also set forth Edwards' twenty-three findings and sixteen recommendations.

Among the findings presented was a conclusion that although the initial response to the overtime on the Loisel Drive job was not racially motivated, the aftermath was. Tr. Vol. III, at 32; Ex. 7A. In particular, Edwards found that the punishment received and the atmosphere created around the punishment had racial overtones. Tr. Vol. III, at 32. She found that Law treated Briggs, a white employee, favorably as compared to Curtis and Tart. For example, she had recommended that Law issue a written reprimand to Briggs for his behavior. Law promised he would and then did not do so. Tr. Vol. III, at 32-34, 43-44. Law later created a memo to document a reprimand that supposedly took

place the previous month, and then lied to Edwards about reprimanding Briggs. Tr. Vol. III, at 44. Edwards determined that although Briggs lacked the skills Tart and Curtis were accused of lacking and was also deficient in other areas, he was never subjected to training. Ex. 7A. For example, Briggs could not weld, was a poor equipment operator, and could not operate the computers well. Ex. 7A.

Edwards found that the threats to Curtis's and Tart's jobs following their calls to Human Resources were retaliation for coming forward with their concerns, and that the threats were designed to put fear in all the employees. Tr. Vol. III, at 32-34; Ex. 7A. She also concluded that the assignment to training was a pretext for discipline. Ex. 7A. In discussing the racial overtones, Edwards noted that on one occasion, Tart called her to say he was going to invite a number of African-American community leaders to march on the property. Edwards called Law to inform him that if anyone came onto the property, he was not to speak to that person but rather to ask the individual to leave and then to call headquarters. Law became very agitated and said, "I'm trying to do my job, I'm trying to do the best job I can. . . . If those nig. . ." Edwards interrupted him, "Rick, you don't want to do that. You don't want to say that." Tr. Vol. III, at 34-35. She testified, "I stopped him from fully using the word nigger." Tr. Vol. III, at 35.

Once Edwards completed her investigation, she met with Curtis and Tart to discuss the results of her inquiry. She told them that she had concluded discrimination had taken place as well as retaliation. She told them it was wrong that their jobs were threatened for calling Human Resources and that the company would not ignore the threat. She had also concluded that because the reassignments had gone on for so long, for a number of months beyond which anyone else had ever been subjected to that kind of training, that the so-called training resembled punishment. She told Curtis and Tart she was recommending that they be returned to their

old duties. Tr. Vol. II, at 84, 218; Tr. Vol. III, at 33, 40; Ex. 7A. She told them Law would be required to attend training on how to deal with diverse groups of people. Tr. Vol. II, at 86.

Edwards' recommendations were given to Law in November 1997. Ex. 11. They were not discretionary but rather the employees involved were required to comply with them. Tr. Vol. III, at 38. Number five on the list read, in part, "David Curtis and Lamarce Tart to be moved back to their trucks, this job will give access to operate the MDT. . . . [T]his will remedy the substantiated unlawful retaliation by Rick Law." Ex. 11.[3] Edwards required that Curtis and Tart be returned to their prior duties because Law was unable to provide a valid business reason for having moved them in the first place. Tr. Vol. III, at 49. He claimed that he moved Tart and Curtis because they were slow workers (a claim not borne out by their performance reviews) but was unable to explain why he did not take similar action with Briggs, a white employee known as a slow worker. Tr. Vol. III, at 49-50. Law sent Edwards a memo on December 11, 1997 detailing which recommendations he had completed and which he had not. Curiously absent from his memo was the disposition of recommendation number five. Ex. 11. When Edwards became aware that recommendation number five was not being implemented, she spoke separately to Law and to Ron Pate, Law's supervisor, making a note of her conversations in order to protect herself. Tr. Vol. III, at 45-46. Law openly refused to implement the recommendation and Pate supported him in this decision. Tr. Vol. III, at 46. Law failed to implement other recommendations as well. Tr. Vol. III, at 47-48. Edwards found that racial tensions in the diverse plant were controlled before Law came into

---

[3] MDT stands for "mobile data terminal," the computer the plaintiffs used in their work before the reassignments.

management, but the situation "exploded" once Law arrived. After Law left, the plant settled down again. Tr. Vol. III, at 53.

Shortly after his meeting with Edwards, Curtis attended a plant-wide meeting called by Law. Law told the employees the meeting was about diversity, threw up his hands and said, "I broke the law. I was wrong." Tr. Vol. II, at 86-87. He told the employees they would have to address each other more formally now and could not use nicknames anymore. As an example, he said, "You can't turn to your co-worker and say 'Hey buddy, give me a wrench.' " Tr. Vol. II, at 87. The discussion then devolved into a "big joke" where the employees laughed about this diversity training. Law told them they had to use first names only, could not be "buddy-buddy" anymore and that Curtis and Tart had "spoiled the party." Tr. Vol. II, at 87, 218.

Curtis was never returned to the meter shop. Tr. Vol. II, at 88; Vol. III, at 51. Indeed, his "training" continued after this point for a total of seven or eight months. During the "training," Curtis was never actually trained to do anything. No written or other training was provided, no progress reports were made, and Law never inquired into his progress. Tr. Vol. II, at 88. As previously noted, although Caucasian employees had taken similar amounts of time to complete leak repair jobs under unfavorable conditions, none had ever been punished. Tr. Vol. II, at 89; Tr. Vol. III, at 181-82. Curtis's job in the meter shop was given to a Caucasian employee with less experience and less seniority. That employee was also given Curtis's one-man truck. Curtis's other responsibilities, such as performing wiring and other repairs at the plant, were outsourced to outside contractors because the new meter shop employee lacked the skills to complete these tasks. Curtis also missed the opportunity to train other apprentice employees because Law failed to tell him he was on a list of potential trainers whose assistance was requested by the Decatur plant. Tr.

Vol. II, at 90; Tr. Vol. III, at 86. Finally, the new meter shop employee was supplied with $4000 worth of new tools in a new tool chest, although Curtis, who had repeatedly requested appropriate tools, had been forced to make do with a small bag of old tools and tools that he brought from home. Tr. Vol. II, at 91-92.

After more than seven months of "training" under Frank Verdu, Law told Curtis he was no longer working for Verdu and he became a floater, taking any assignments that were available each day. Tr. Vol. II, at 94. He remained a floater until he was able to use his seniority to bid out to a construction crew in 1999. He bid to join the crew so that he could get away from the harassment and ridicule he received from co-workers in the East St. Louis plant. Tr. Vol. II, at 95.

Tart's "training" lasted five wet, cold, miserable months. Tr. Vol. II, at 213. In his twenty years of service at Illinois Power, he had never known anyone to be subjected to this sort of "training" for more than two weeks. Tr. Vol. II, at 213. No white employees who were involved in jobs taking similar lengths of time had ever been punished or sent to some indeterminate, undefined training. Tr. Vol. II, at 214. No progress reports were made of his training and Law never inquired of his progress. His one-man truck was given to a white employee. Tr. Vol. II, at 213. Edwards' recommendation that he be returned to the one-man truck was not honored, Briggs continued to harass him with obscene words and gestures, and "the whites were still separated from the blacks." Tr. Vol. II, at 219. Tart reported that "[t]he white guys were shoving me, if I even walked by or stand [sic] up, then they would get away from me." Tr. Vol. II, at 220. He was treated like an outcast. Tr. Vol. II, at 219. At the end of five months, he was placed back on a one-man truck assignment. Tr. Vol. II, at 246.

At trial, Law denied that he had seen Edwards' sixteen recommendations before the litigation began. Tr. Vol. IV, at

113. He conceded this was not true when he was confronted with a copy of his own memo with the sixteen recommendations stapled to it. Tr. Vol. IV, at 117-19, 121. Also at trial, Law initially held to the story he told Edwards, that he fulfilled recommendation number three, to place a reprimand in Briggs's personnel file for harassment and intimidation in December 1997. Tr. Vol. IV, at 124. When confronted with his actual memo dated two months later in January 1998, he was forced to concede that he had lied to Edwards when he told her he had completed the recommendation. Tr. Vol. IV, at 126. Briggs later testified that Law did not ever discipline him for his behavior towards Curtis. Tr. Vol. IV, at 167. Rather, another manager delivered the discipline. Tr. Vol. IV, at 167. Law conceded that an "individual employment plan" he was required to develop for himself each year identified the sixteen recommendations as a goal for completion that year. Tr. Vol. III, at 81. He even conceded that although the reassignment of Tart and Curtis began as a training exercise, at some point it turned into a job assignment. Tr. Vol. IV, at 146.

## II.

Curtis and Tart sued Illinois Power and Law for race discrimination and retaliation in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e, et seq. After a jury verdict in favor of the plaintiffs, the defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50. The trial court granted the motion, concluding that no reasonable jury could find that the defendants took adverse employment actions against Curtis and Tart. The court also determined that the reassignments could not serve as retaliation for engaging in protected conduct because Curtis and Tart reported race discrimination to Linda Edwards the day after they were reassigned. Finally, the district court credited the defendants' version of the context in which the

reassignments took place. The defendants argued that the reassignments were made during a time when the company was largely eliminating one-man trucks and moving to a different business model of two-man trucks with cross-trained employees on each truck, demonstrating that the reassignments were not discriminatory or retaliatory. Each of these conclusions is faulty; none serves as an adequate reason to overturn the jury verdicts in favor of Curtis and Tart.

The district court attacked the verdicts both factually and legally, and we will address the facts first. When entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. *Reeves*, 530 U.S. at 150. In doing so, the court must draw all inferences in favor of the nonmoving party, here Curtis and Tart. *Id.*; *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002). We may not make credibility determinations or reweigh the evidence; we must disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves*, 530 U.S. at 150-51. "That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontra-dicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves*, 530 U.S. at 151 (internal quote marks omitted). We are particu-larly careful in employment discrimination cases to avoid supplanting our view of the credibility or weight of the evidence for that of the jury. *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1054 (7th Cir. 1990). *See also Tuohey v. Chicago Park Dist.*, 148 F.3d 735, 740 (7th Cir. 1998) (noting we are particularly careful in employment discrimination cases not to substitute our own view of credibility or weight of the evidence for that of the jury). This is because employment discrimination cases often involve sensitive and difficult issues of fact, and plaintiffs often have only circumstantial evidence on which to rely. *Hybert*, 900 F.2d at 1054.

The district court found that the reassigned positions on the two-man trucks were not objectively inferior to other positions filled by gas journeymen but merely caused bruised egos and personal humiliation. This is so, the court found, because there was no showing that the tasks on the two-man truck involved any less a degree of responsibility or constituted a stripping of duties as compared to the meter shop and the one-man truck. When viewing the facts in a light most favorable to the winning plaintiffs, this is simply not true. Before the reassignment, Curtis worked independently, mostly indoors, repairing gas meters and other equipment, working with computers, maintaining the building's electrical and mechanical systems, and sometimes answering customer service calls on a one-man truck. At times, he assisted the office staff with their computer problems. Tart also worked independently on a one-man truck, which involved customer contact, skilled work repairing gas leaks both inside and outside of homes, and computer access. After the reassignment, which the company's own Human Resources manager concluded was due to race discrimination, Curtis and Tart worked outdoors in winter digging ditches under the supervision of Caucasian workers they themselves had previously trained. Gone was the independence, the largely indoors environment, the computer access, the skilled labor involved in fixing equipment and repairing gas leaks, and the customer contact. Instead, they were now construction laborers, digging ditches, under the hyper-vigilant eye of a manager who told their new supervisors to work them until they quit. Characterizing their preference for their former positions as "subjective" strains credulity and strips the jury of its province as fact-finder.

According to the district court, the case law does not support a finding of adverse employment action because

Curtis and Tart retained their salary, title and benefits.[4] The court characterized the reassignments as lateral moves that could not be considered adverse under the case law. But a review of the cases on which the district court relied reveals otherwise. Consider *Hernreiter v. Chicago Housing Authority*, 315 F.3d 742 (7th Cir. 2002), *cert. denied*, 124 S. Ct. 472 (2003). There the plaintiff was reassigned from the position of field investigator to auditor (a position he previously held). We noted that the financial terms of employment were identical and the same skills were used in each position. The major differences were that investigators were offered the use of a company car and were excused from having to sign in and out of an office. The auditors, on the other hand, did not have to travel out in the field and held an office position. Although the plaintiff had an idiosyncratic preference for being out in the field, we concluded that the trivial differences between the two jobs did not justify "trundling out the heavy artillery of federal anti-discrimination law." 315 F.3d at 745. As we have described, the reassignments here did not involve the use of the same skills, and the differences between the jobs could hardly be described as trivial. The reassigned jobs were objectively inferior; they involved far less skill and signifi-

---

[4] The district court framed the issue in terms of the plaintiffs' failure to prove an element of the *prima facie* case for employment discrimination. Of course, after a trial on the merits, disputes about the *prima facie* case fall away and we need resolve only the ultimate question of whether there was sufficient evidence for the jury to conclude that race was a determinative factor in an adverse employment action taken by the defendants. *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 514 (7th Cir. 1993); *U.S. E.E.O.C. v. Century Broadcasting Corp.*, 957 F.2d 1446, 1455 (7th Cir. 1992). The sole element of the claim challenged by the defendants is whether they took an adverse employment action against the plaintiffs and thus that is where we will focus our discussion.

cantly harsher working conditions than the plaintiffs' prior positions. Few if any workers would choose to leave independent, skilled positions on one-man trucks or in the meter shop to report to winter ditch digging duty under the supervision of employees they had previously trained. Few workers in today's job market would choose to give up access to computers so they could spend the winter on trenchers and with shovels, digging the holes that made way for other workers to complete the skilled part of the labor. This preference is not idiosyncratic; it is universal.

The district court also likened this case to *Flaherty v. Gas Research Inst.*, 31 F.3d 451 (7th Cir. 1994). Flaherty's position as principal scientist was to be eliminated and he was instead offered a position as senior project manager. The company considered this a lateral transfer with no change in salary or benefits. The responsibilities of the two jobs were comparable although the new position held greater job growth potential. 31 F.3d at 457. Flaherty objected to the new position largely because it involved a title change and required him to report to a former subordinate who was merely a manager when he had previously reported to a senior vice president. 31 F.3d at 457. We found that the title change and different reporting relationship were largely semantic "where the employee's salary, benefits, and level of responsibility would remain unchanged." *Id.* We noted that the change in reporting may well have bruised Flaherty's ego but a plaintiff's perception that a lateral transfer would be personally humiliating is insufficient, *absent other evidence*, to establish a materially adverse employment action. *Id.* It is the other evidence that distinguishes the instant case, evidence that the level of responsibility diminished significantly and that skills involving gas line repair and equipment maintenance were set aside so that the plaintiffs could learn to dig ditches to the satisfaction of a manager who had to be restrained from calling them "niggers." *Traylor v. Brown* is similarly

distinguishable because the plaintiff there was not demoted or disciplined and her job responsibilities were not materially diminished. 295 F.3d 783 (7th Cir. 2002).

*Crady* is no more comparable than the other cases on which the district court relied. *Crady v. Liberty Nat'l Bank & Trust Co. of Indiana*, 993 F.2d 132 (7th Cir. 1993). Crady was hired as an assistant vice president and manager of a bank. He was later transferred to another branch of the bank into the position of loan officer. Although there was a title change, there was no wage reduction. Crady demonstrated that his responsibilities changed, but he failed to show that his new responsibilities were less significant than those of his prior position. With this failure of proof, we held, the title change alone was not enough to show materially adverse employment action. 993 F.2d at 136. We remarked that a materially adverse change may be indicated by, among other things, "significantly diminished material responsibilities or other indices that might be unique to a particular situation." 993 F.2d at 136. Here, as we have noted, there was plenty of evidence of significantly diminished responsibilities. The list need not be repeated; the plaintiffs were not simply shuffled from one desk job to another as occurred in *Crady*.

That leaves *Spring v. Sheboygan Area School Dist.*, 865 F.2d 883 (7th Cir. 1989), where a school principal was transferred to a dual principalship over two schools of similar staff and student size during a district reorganization. Her reassignment included a two-year contract and a merit pay increase. 865 F.2d at 885. The new job was farther from Spring's home but reimbursed her for travel expenses. We summarized the new job as "another principalship for more pay under a longer-term employment contract," and accordingly declined to characterize it as materially adverse. 865 F.2d at 886. This ruling was hardly a stretch because the plaintiff herself had testified in her deposition that she did not think the new position was a "lesser job."

*Id.* None of the factual circumstances of these cases comes close to what happened to Curtis and Law.

The case law in fact supports the jury's verdict amply. In *Hernreiter*, we set forth three categories of cases where the courts have found the criteria for materially adverse employment action to be met: (1) cases in which the employee's compensation, benefits or other financial terms of employment are diminished, including cases where employment is terminated; (2) cases in which a nominally lateral transfer without a change in financial terms significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced; and (3) "[c]ases in which the employee is not moved to a different job or the skill requirements of his present job altered, but the *conditions* in which he works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment—an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet." *Hernreiter*, 315 F.3d at 744-45 (emphasis in original). Curtis and Tart are well within the bounds of the third category and arguably within the bounds of the second, based on the evidence accepted by the jury. Curtis's work area was not just moved to a closet; it was moved to a cold, wet, muddy trench. Likewise for Tart, who lost the one-man truck and the work that went with it. If the moved desk is an objectively and sufficiently worse condition of employment, it is difficult to conceive how the district court characterized the move from one-man trucks and the meter shop into the trenches as "subjective" and purely lateral. *Cf. Parrett v. City of Connersville, Indiana*, 737 F.2d 690, 693 (7th Cir. 1984) (chief of detectives relegated to desk job with no duties suffered a loss of property cognizable under the Fourteenth Amendment). *See also Durham Life Ins. Co. v.*

*Evans*, 166 F.3d 139, 152-53 (3d Cir. 1999) (loss of an office and secretary deemed adverse employment action even though pay and title remained the same); *Parrish v. Immanuel Medical Center*, 92 F.3d 727, 731-32 (8th Cir. 1996) (adverse action found when hospital registrar who previously received patients into hospital, obtained information from patients for hospital records and responded to public inquiries was reassigned to clerical duties that consisted of assembling and stapling papers together with no computer work or patient contact).

Even *Flaherty*, on which the district court relied in part, clarified that an employer could not insulate itself from liability for discrimination simply by offering a transfer at the same salary and benefits. 31 F.3d at 456-57.

> Indeed, we observed in *Collins v. State of Illinois*, 830 F.2d 692, 703 (7th Cir. 1987), that other courts have found adverse employment actions in the following circumstances where salary and benefit levels were retained: in an employer's moving an employee's office to an undesirable location, transferring an employee to an isolated corner of the workplace, and requiring an employee to relocate her personal files while forbidding her to use the firm's stationary and support services.

*Flaherty*, 31 F.3d at 457 (internal quote marks omitted). *See also Collins*, 830 F.2d at 702 n.7 (collecting cases where a lateral transfer with no loss in pay or benefits nonetheless qualified as a materially adverse employment action); *McCabe v. Sharrett*, 12 F.3d 1558, 1564 (11th Cir. 1994) (secretary laterally transferred to a clerk-typist position with no loss in pay demonstrated adverse employment action where the new position entailed fewer responsibilities, more menial tasks and a lesser opportunity for salary increases in the future).

The instant case is more comparable to *Collins* than to any of the cases relied upon by the district court. Collins

was an African-American library consultant who was transferred from the library's "development unit" to its "reference unit" with no change in pay or benefits. We found that the following evidence "amply demonstrated" adverse job action:

> She was transferred away from a job she enjoyed. She was placed in a new department. Her new supervisors seemed unsure of what plaintiff's responsibility and authority would be at the newly created job. Plaintiff was relegated to doing reference work instead of consulting. Plaintiff previously had her own office, a telephone at her desk, printed business cards, and listings in professional publications as a library consultant. After her transfer plaintiff was placed at a desk out in the open. She did not have her own office. Her desk was situated just outside the supervisor's office where a receptionist's desk typically would be located. Plaintiff had no telephone at her desk with which she could conduct her business responsibilities. She was not allowed to have business cards printed and she was no longer listed in professional publications as a library consultant.

*Collins*, 830 F.2d at 704. Both Curtis and Tart were transferred away from jobs they enjoyed and placed in new positions. Curtis's new supervisor, Frank Verdu, had no idea what he was supposed to be doing with Curtis and was told only that he was being assigned Curtis because no one else would take him, and that he should work him until he quit. Verdu questioned the validity of the training rationale because he himself had been trained by Curtis and believed he had nothing to teach him, a fact of which Law was well aware. Where previously Curtis and Tart had access to one-man trucks (and in Curtis's case access to the meter shop as well) and all of the attendant benefits of those positions, now they were outdoors nearly all the time, similar to the moving of Collins' desk. Collins lost her telephone and

business cards; Curtis and Tart lost their computers, their independence, customer contact and their skilled job duties. Collins' loss is indistinguishable from the losses suffered by Curtis and Tart. *See also Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 649-51 (7th Cir. 2001) (employee laterally transferred from position as building manager to assistant managerial position involving severely diminished job responsibilities but with no loss in pay, benefits or title adequately demonstrated materially adverse employment action); *Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir. 1994) (decreasing some job responsibilities while increasing other duties can, under limited circumstances, constitute an adverse employment action; an ostensibly lateral transfer may be an adverse employment action if it is accompanied by a dramatic downward shift in skill level required to perform job responsibilities). The evidence here was more than adequate to support the jury's verdict that Curtis and Tart suffered materially adverse employment actions.

We turn then to the retaliation claims. To prevail on a claim for retaliation, a plaintiff must show that (1) he complained about conduct that is prohibited by Title VII; (2) he suffered an adverse employment action; and (3) the adverse employment action was caused by his opposition to the unlawful employment practice. *Spearman v Ford Motor Co.*, 231 F.3d 1080, 1086 (7th Cir. 2000), *cert. denied*, 532 U.S. 995 (2001). The district court found that the plaintiffs' retaliation claim failed on all three prongs. We have already addressed the adverse employment action question, which the jury resolved in favor of the plaintiffs. We now address the other two prongs.

According to the district court, the reassignments took place the day before Curtis and Tart called Human Resources to complain about the discipline for the Loisel Drive job. In order to be retaliatory, the court held, the reassignments must have come after the complaint. There are two

answers to the court's questionable reasoning and the jury was free to adopt one or both. First, the reassignments came at the end of many months of intense scrutiny by Law following the plaintiffs' first call to Human Resources. After Law's agitated pronouncement in 1996 that "somebody done called EEOC," he made good on his promise to watch the plaintiffs closely, waiting for a misstep. He considered the Loisel Drive job to be that misstep and he applied such a heavy hand that first the union and then the company's own human resource manager ordered him to undo his so-called discipline. The reassignment was thus one more step in Law's campaign of increased scrutiny following the first complaint of race discrimination. That is one way in which the jury may have viewed the reassignments as retaliatory. The jury was free to find that the reassignments were also retaliation for the second call to Human Resources, even though the timing at first appears off. Law's insistence that the plaintiffs remain in "training" for five and seven months respectively, when no other employee had been subjected to training for more than a few weeks demonstrates that continuing the punishment for such a lengthy period after learning of the call to Human Resources was indeed retaliatory. Law even went so far as to openly refuse to implement the corrective action dictated by the company's own human resource manager. When ordered to return Curtis and Tart to their former assignments, he refused and his supervisor backed him up. This refusal came, of course, after the plaintiffs complained to Human Resources. In this sense, the jury was free to find that the retaliation was not the original reassignment to training (which might have lasted a few weeks if the plaintiffs had not complained about race discrimination), but rather the lengthy continuation of the "training" and the refusal to return the plaintiffs to their former positions after learning of the complaint of race discrimination.

The district court also concluded that the initial call to Human Resources could not be "protected activity" because

that call was not race-related and was not understood by the defendants to be race-related. This conclusion erroneously construes the evidence in a light most favorable to the defendants. Curtis testified that he told Justice that he and Tart were being treated in a biased manner by Law, that a white employee was attacking and harassing them, and that Law was doing nothing about it despite their complaints. Tr. Vol. II, at 36-37. Curtis testified, "I told him that it was biased and that's the term I used. He understood what I was saying. He knew I was talking about race." Tr. Vol. II, at 156. Justice then called Law to discuss the incident and Law in turn called a meeting to "flush the birdie," that is, to determine who blew the whistle. Law's proclamation at this meeting that "somebody done called EEOC" demonstrated that Law was certainly aware a complaint of race discrimination had been made. The reference to the EEOC was all the jury needed to conclude that both Justice and Law perceived the complaint to be race-related. Curtis's testimony that he discussed bias and the race of the harasser when he spoke to Justice corroborated this. This was sufficient evidence from which the jury could conclude that Curtis was reporting race discrimination and that Justice and Law understood the call to be a complaint regarding race discrimination.

Finally, the jury was not persuaded by the company's proffered explanation for the reassignments. The company argued at trial that the reassignment occurred at a time when it was cross-training its workers to be both laborers (the workers who dug ditches) and fitters (the skilled position Curtis and Tart originally held) so that both workers on a two-man truck would be capable of completing both laborer and fitter tasks. The purpose of this shift was to save salary costs, especially overtime. The company claimed Curtis and Tart were reassigned for training as laborers so they could be part of the company's new cross-trained two-man trucks. The jury was not obliged to believe

this explanation and the verdicts are clear indications that they rejected this *post hoc* excuse for the reassignments. *Reeves*, 530 U.S. at 150-52. Recall the standard we are to apply once the jury has spoken. In entertaining a Rule 50 motion for judgment as a matter of law, we must draw all reasonable inferences in favor of the nonmoving party, in this case Curtis and Tart. *See id.* Although we review the record as a whole, we must disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves*, 530 U.S. at 151. That is, we should give credence to the evidence favoring the nonmovant as well as the evidence supporting the moving party "that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves*, 530 U.S. at 151. The jury was not required to believe the defendants' testimony regarding cross-training for two-man trucks. All of this testimony came from interested witnesses, and was contradicted by, among other things, the company's continued use of one-man trucks. Indeed, the company continued to use the one-man trucks originally assigned to Curtis and Tart; those very trucks were reassigned to Caucasian employees. Ultimately, Tart returned to a one-man truck, indicating the company had not in fact phased them out in favor of the two-man cross-trained trucks. There was also evidence that neither of the plaintiffs' new supervisors were told to train the plaintiffs, and one testified he had nothing to teach the man who had trained him. Rather, the new supervisors were told to work the plaintiffs until they quit. The evidence taken in a light most favorable to the plaintiffs shows that, even if the company was cross-training some workers for this new system, the plaintiffs were not reassigned as a result of the new need for cross-trained employees but rather were reassigned because of their race and because they complained about race discrimination. Indeed, the company's own human resources manager concluded that the prolonged reassignment was punitive and race-based, and ample evidence demonstrated that

"training" was merely a pretextual label applied to the punishment. The jury rejected the employer's purportedly nondiscriminatory reason for adverse action. *Gustafson*, 290 F.3d at 909 ("We are not entitled to speculate as to what the employer may have considered the facts to be and what concerns about operational efficiencies it may have had, once the record shows what those concerns really were."). We may not substitute our judgment for that of the jury. We therefore reverse the judgment of the district court and remand with directions to reinstate the jury verdict.

Because we are reinstating the verdict, we must briefly address the district court's conditional grant of a new trial. The district court based this ruling on its belief that the verdict was against the manifest weight of the evidence. This belief in turn rested on the court's erroneous conclusions that (1) the plaintiffs failed to prove the element of adverse employment action on their claim of employment discrimination; and (2) for the retaliation claim, the plaintiffs failed to prove that they complained about conduct prohibited by Title VII, and failed to show a causal connection between their complaint and the actions taken by their employer. Because there was ample evidence supporting the jury's verdict on both of these claims, any grant of a new trial would be unwarranted and erroneous. We therefore reverse the court's conditional grant of a new trial.

### III.

In summary, we reverse the district court's conditional grant of a new trial. We also reverse the court's judgment in favor of the defendants and remand with directions to reinstate the jury verdict.

REVERSED and REMANDED.

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*